# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #053

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **5th day of December, 2018**, are as follows:

**BY CRICHTON, J.**:

2016-KA-1841    STATE OF LOUISIANA v. LEE TURNER, JR. (Parish of E. Baton Rouge)

This is a direct appeal under La. Const. art. V, § 5(D) by defendant, Lee Turner, Jr., who was indicted by a grand jury for the first degree murders of Edward Gurtner, III and Randy Chaney, committed while engaged in the perpetration of armed robbery. Following the close of evidence, a jury unanimously found defendant guilty of two counts of first degree murder and, at the conclusion of the penalty phase of the trial, unanimously recommended sentences of death. In his appeal, defendant raises 32 assignments of error. Finding merit to defendant's assignment of error related to his "reverse-Witherspoon" challenge, his sentences are hereby vacated. Finding no merit to his remaining challenges, his convictions are affirmed, and this matter is remanded to the trial court for further proceedings.

CONVICTIONS AFFIRMED; DEATH SENTENCES REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

GUIDRY, J., concurs in part, dissents in part, and assigns reasons.
HUGHES, J., concurs in part and dissents in part for the reasons assigned by Guidry, J.

SUPREME COURT OF LOUISIANA

No. 2016-KA-1841

STATE OF LOUISIANA

VERSUS

LEE TURNER, JR.

ON APPEAL
FROM THE NINETEENTH JUDICIAL DISTRICT COURT
FOR THE PARISH OF EAST BATON ROUGE

**CRICHTON, J.**

This is a direct appeal under La. Const. art. V, § 5(D) by defendant, Lee Turner, Jr., who was indicted by a grand jury for the first degree murders of Edward Gurtner, III and Randy Chaney, committed while engaged in the perpetration of armed robbery. Following the close of evidence, a jury unanimously found defendant guilty of two counts of first degree murder and, at the conclusion of the penalty phase of the trial, unanimously recommended sentences of death. In his appeal, defendant raises 32 assignments of error. Finding merit to defendant's assignment of error related to his "reverse-*Witherspoon*"[1] challenge, his sentences are hereby vacated. Finding no merit to his remaining challenges, his convictions are affirmed, and this matter is remanded to the trial court for further proceedings.

## FACTS AND PROCEDURAL HISTORY

On the morning of Sunday, March 27, 2011, Edward "Eddie" Gurtner III and Randy Chaney reported to work at the Carquest auto store on Airline Highway in

---

[1] *See Witherspoon v. Illinois*, 391 U.S. 510 (1968) (holding that a prospective juror who would vote automatically for a life sentence is properly excluded); *State v. Robertson*, 92-2660 (La. 1/14/94), 630 So. 2d 1278, 1284 (explaining that, in a "reverse-*Witherspoon*" context, the basis of the exclusion is that a prospective juror "will not consider a life sentence and . . . will automatically vote for the death penalty under the factual circumstances of the case before him . . .").

Baton Rouge. Mr. Gurtner's oldest son, Joey Gurtner,[2] stopped by the store that same morning to pick up transmission parts for his own vehicle and bring breakfast to his father. Before Joey left, his father instructed him to pull his truck around the back of the store to load boxes. While at the back of the store, Joey noticed a white BMW parked in the back and saw a man walking along the side of the building. Joey asked his father who owned the BMW, and Mr. Gurtner replied that it belonged to the nephew of Leroy Moss, Lee Turner. Joey did not interact or get in close proximity of the man. Joey finished loading boxes into his truck and left.

Mr. Gurtner's wife, Elizabeth Gurtner, expected him home at 3:30 or 4:00 that afternoon, after the store closed at 3:00 p.m. When her husband did not return home, Mrs. Gurtner began to call both Mr. Gurtner's cell phone and the Carquest line, but there was no answer. By 4:45 or 5:00 p.m., with still no sign of her husband, Mrs. Gurtner and her youngest son, Jamie, then 13 years old, traveled to Carquest to check on Mr. Gurtner. Upon arriving there, Mrs. Gurtner and Jamie discovered Mr. Gurtner's body. Mrs. Gurtner frantically called 911, and the dispatcher instructed Mrs. Gurtner to leave the store immediately, which she and Jamie did.

Randy Chaney's wife, Lola Chaney, spoke with her husband around lunchtime that day, and Mr. Chaney informed her that Braillon Jones, a coworker, had shown up to work a little late, around 10:00 a.m. At some point that afternoon, the Chaneys' son, Trevor Chaney, informed his mother that he had attempted to call his father at work to ask him a question pertaining to an oil change, but that his father did not answer the phone. Somewhat alarmed, Mrs. Chaney tried to call her husband at around 3:15 p.m., but he did not answer. Mrs. Chaney, becoming more anxious,

---

[2] Joey was born Edward Gurtner, IV, but is known as Joey and is hereinafter referred to as such.

made several additional calls, all of which also went unanswered. She then instructed her son to return home so that she could take his vehicle to go check on Mr. Chaney. As she waited, sheriff's deputies arrived at her home and informed her that her husband had been killed at Carquest.

Police arrived at Carquest and initially treated the scene as an active shooter situation. Officers entered and cleared the building and ultimately discovered the bodies of Mr. Chaney and Mr. Gurtner. Police then secured and roped off the scene as additional police units and detectives arrived. Eventually, police discovered that Braillon Jones had been working at Carquest with both victims on the day of the murders, and Detective Nicholas Locicero and Captain Todd Morris went to Jones's home to interview him in the early morning hours of Monday, March 28, 2011. Jones accompanied the officers to the police station for an interview. Jones informed Detective Locicero that a black male wearing a white shirt, black pants, with a tapered haircut, slim build, with no facial hair, was present inside the Carquest earlier in the morning on the day of the shootings, as well as when Jones left for the day just before 3:00 p.m.

Meanwhile, Lead Detective Sergeant Sonya Harden had arrived at the scene and received information from Joey Gurtner that Turner had been at the store earlier on the morning of the shootings. Sergeant Harden relayed this information to Detective Locicero. Detective Locicero prepared a photographic lineup including the defendant, and returned to Jones's residence to present him with the lineup. Jones identified defendant as the person he had seen at the Carquest in the morning and again in the afternoon while he was working.

Police learned that Turner was a Carquest employee and was scheduled to report to work later that morning (Monday, March 28, 2011) at 8:00 a.m. at the

3

Carquest location on Government Street. Detective Locicero and Deputy Stephen Cadarette arrived at that location prior to 8:00 a.m. and waited for Turner. When Turner arrived, he pulled up in a white 1990 BMW, parked, and entered the store. The investigators followed him inside, introduced themselves to Turner, and informed him they were investigating a homicide at Carquest. Detective Locicero testified that Turner was fully cooperative and wanted to speak with investigators to clear his name. Turner walked outside with the investigators and, despite seeing a knife in Turner's pocket, Detective Locicero did not search Turner (though he did ask Turner to remove the knife, and Turner complied), nor did Detective Locicero inform Turner that he was a suspect. After receiving oral consent to search Turner's vehicle, Detective Locicero presented Turner with a waiver of search warrant form for the vehicle, which Turner read and signed. Nothing of evidentiary value was recovered in the vehicular search.

Detective Locicero transported Turner to the violent crimes unit for further questioning, though he did not place Turner under arrest. Turner rode in the front passenger seat of the detective's truck, and he was not handcuffed. Turner did not appear to be under the influence of alcohol or other drugs, and had no trouble communicating with Detective Locicero. Turner was placed in an interview room by himself and, some time later, Detectives Harden and Locicero entered the room to begin an interview. The interview would ultimately last approximately 11 hours, from 9:43 a.m. to 8:30 p.m., though Turner was left alone in the interview room between rounds of questioning for roughly six of the 11 hours.[3]

The interview began when Detective Harden initiated the following exchange

---

[3] Turner was permitted several bathroom breaks and was offered food and water.

with Turner:

Q: Uh, just as a formality um, before we start the interview, I have to advise you of your rights. It does not mean you're in trouble or going to jail or anything.

A: Okay.

Q: Okay?

A: Yeah.

Q: All right. You have the right to remain silent. Anything you say can be used against you in court . . .

A: Okay.

Q: You have a right to an attorney. If you cannot afford one, one will be provided for you. You have the right to have an attorney present while answering questions. If you choose to answer questions now without an attorney, you can stop at any time. Do you understand that?

A: I understand ma'am.

Q: Okay. And you can read and write the English language?

A: Yes ma'am.

Q: You're good – okay. What I need you to do for me is sign your name there and print for me saying that you understand your rights and I'm not forcing you to talk to me.

Turner then executed a waiver of rights form.[4] Turner explained to the detectives that he worked for Carquest primarily at the Plank Road and Government Street locations, but that he was going to begin doing some work at the Airline location. He further explained that he went to the Airline location twice on Sunday, March 27, 2011, to introduce himself to the store manager in anticipation of

---

[4] The form tracks standard *Miranda* language and informs the signee that: he has the right to remain silent; anything said may be used against him in court; he has the right to speak with an attorney prior to any questioning and that attorney may be present during questioning; if he cannot afford an attorney, one will be appointed; if he decides to answer questions now without an attorney present, he can stop answering questions at any time to seek advice from an attorney or for any other reason.

commencing work there. He told the detectives that he first visited the store on Airline that morning, approximately 30 minutes after the store had opened, and he introduced himself to the store manager and discussed a mutual acquaintance, Turner's uncle, Leroy Moss. Turner then told detectives that after visiting his girlfriend during the day, he returned to the store just before closing to discuss his schedule and inquire about the possibility of him becoming a permanent (as opposed to rotating) employee at the Airline location.

Turner also told detectives that he spoke with a black male driver working at the store, and that he (Turner) walked around the store to get acquainted with the layout and learn where things were located. He further stated that Mr. Gurtner showed him around the store, and that at one point he helped Mr. Gurtner take a few boxes to the dumpster. The driver left the store before closing time, and Turner stated he left the store about ten minutes after the driver left. Turner stated that as he was leaving, Mr. Chaney was "counting the register" and Mr. Gurtner was putting up stock. No one immediately locked the door behind him as he left. Later in his police interview, Turner told the detectives the point of his second visit to the Carquest was to look for parts for his car.

Turner told detectives that after he left the store in the afternoon, he went home and changed clothes, and then went back to his girlfriend's house. Turner stated that at some point later that night, after leaving his girlfriend's house, he drove past the Carquest where the shootings occurred and saw the area taped off and a large police presence. He called Leroy Scales, the store manager for a different Carquest location, in an attempt to find out what was going on. Turner then parked his car and joined the growing crowd of people outside the Carquest. He stated in

his interview that this was when he first learned there had been a murder. He did not inform officers on the scene that he had been in the store twice that day.

Turner continued to deny his involvement in the murders, even when detectives eventually confronted Turner with the facts that he was the last person to be seen with the victims at 2:47 p.m., and that the victims must have been killed in the small window of time between when Jones left for the day at 2:47 p.m. and when one of the victims failed to answer his phone at 3:13 p.m. Turner informed detectives that he left the store approximately five minutes after Jones left the store, and that, as he was pulling out of the parking lot, a white woman with a blonde ponytail driving a blue Camry pulled into the parking lot.

While Turner was being interviewed, the investigation was progressing on other fronts. Chuck Smith, an investigator with the District Attorney's office, visited the crime scene at some point early Monday evening and spotted a gun in a weeded, bushy area outside the rear of the Carquest building. Smith immediately alerted the East Baton Rouge Sheriff's Office, and officers recovered the weapon and sent it to the crime lab for forensic testing. Additionally, Detective Locicero prepared a search warrant for the residence that Turner shared with his uncle. The application for the search warrant was based, in part, on video footage from a nearby business that showed a white four-door vehicle matching the description of Turner's vehicle. In the footage, the vehicle was observed circling the block on which the Carquest was located three times after 3:00 p.m. The warrant was issued and police executed it late Monday afternoon. The search revealed $350 in cash wrapped in pay slips from Pep Boys Auto Parts (Turner's former employer) in Turner's bedroom. In trashcans outside the home, officers found a white garbage bag containing work boots, black pants, a white t-shirt, black and grey gloves, and two Regions Bank bags. In each

7

bank bag was a deposit slip from the Carquest on Airline Highway—one for $125 and one for $357. The deposit slips were dated March 25, 2011 and March 26, 2011, the two days before the murders.

Turner, who was still in the interview room, was confronted with photos of his clothing, the bank bags, and the Carquest register receipts that police found in the trashcan outside his house. Turner's adamant denials of any involvement in the murders immediately gave way to an admission of involvement, though initially Turner downplayed his own actions.

Confronted with the evidence from his residence, Turner told detectives that Leroy Scales, a manager at a different Carquest location, had planned and committed the murders, and had forced Turner into helping him as repayment for helping Turner secure a job. Turner stated that Scales was already in the building when he arrived at the Carquest, and that Scales had previously instructed Turner to keep the two employees busy by talking to them. Turner stated that Scales then told him to leave, and that he heard one gunshot as he was leaving. Shortly after this confession, the detectives informed Turner that a gun had been found behind the Carquest, asked Turner if they would find his prints on it and if, in actuality, he had committed the murders alone. Turner immediately responded, "Yes, sir."

Turner explained that Scales had nothing to do with the murders, and gave details on how the crimes were committed. Turner stated that one of the Carquest employees "called me a ni**er and I heard him and I just clicked." Turner proceeded to explain that he shot Mr. Chaney first, and then forced Mr. Gurtner to remove and hand over the cash. Mr. Gurtner then attempted to run towards the back of the store, and Turner stated that he emptied "the clip" firing at Mr. Gurtner from behind. He explained that the gun was a .38 caliber weapon and that he threw it in the bushes

8

behind the Carquest after he left through the back door. The interview concluded with Turner explaining that he did not go to the store with the intention to kill anyone, but when he heard the employee call him a racial slur, he said "to hell with it." Turner then requested to call his girlfriend, and the interview ended. Police immediately arrested Turner and booked him on two counts of first degree murder.

A grand jury indicted Turner on July 1, 2011, on two charges of first degree murder. Turner was arraigned on July 26, 2011, and entered a plea of not guilty. On September 12, 2011, the state filed notice of intent to seek the death penalty and designated two separate statutory aggravating circumstances. In the notice of intent, the state specified that the prosecution was predicated upon violations of R.S. 14:30(A)(1) and (3) (that the defendant had specific intent to kill or to inflict great bodily harm and was engaged in the perpetration of armed robbery; and, that defendant had the specific intent to kill or to inflict great bodily harm upon more than one person), and that it would allege the corresponding statutory aggravating circumstances of La. C.Cr.P. art. 905.4(1) and (4) at the sentencing phase (the offender was engaged in the perpetration or attempted perpetration of armed robbery; and, the offender knowingly created a risk of death or great bodily harm to more than one person).

The defense filed several pretrial motions, including a motion to declare La. C.Cr.P. art. 905.2(B) unconstitutional; a motion to declare the death penalty unconstitutional; a motion to bar death qualifications and declare La. C.Cr.P. art. 798 unconstitutional; and, a motion to exclude death as a possible punishment. The trial court heard argument on these motions and denied them on October 11, 2011, without reasons.

9

The defense also filed a motion to suppress Turner's statement, alleging that Turner did not knowingly and intelligently waive his rights based on misleading statements by Detective Harden when administering Turner's *Miranda* rights that downplayed the seriousness of the situation. Defendant also argued that the search of his home was unconstitutional due to a defective warrant, and thus the evidence seized from his home should be suppressed. Additionally, defendant argued that because he only confessed to the murders after being presented with the illegally-obtained evidence, his statements were fruit of the poisonous tree and should be suppressed on those grounds.

The court held a hearing on defendant's motion to suppress his confession over two days. The state played the roughly six hours of video footage of the actual interview (fast-forwarding through the times Turner was left alone in the room), and presented the testimony of Detective Harden, Detective Cadarette, Lieutenant Moore, and Detective Locicero. The witnesses all testified generally that Turner was cooperative when detectives initially approached him as he reported to work on the morning after the murders, willingly gave consent for the search of his vehicle, and that, once transported to the Violent Crimes Unit, he was read his rights directly from the standard *Miranda* form, and then knowingly and voluntarily read and signed the waiver of rights form before questioning. The defense did not call any witnesses but argued, generally, that Turner had no criminal record and was unfamiliar with police procedure; that Detective Harden mischaracterized his *Miranda* rights as "just a formality;" that Detective Moore threatened defendant with the death penalty and the prospect of his unborn child seeing a newsflash of his lethal injection in the future; and, that promises were made that confessing could save his life. The court denied the motion without reasons.

10

On May 14, 2012, the court heard arguments on defendant's motion to suppress the physical evidence recovered from his residence. The state pointed out that the defense did not allege any intentional misrepresentations in the affidavit accompanying the application for a search warrant; nonetheless, the state argued, even omitting the alleged misrepresentations in the affidavit, probable cause existed to obtain a search warrant for Turner's residence due to the fact that he was the last person seen with the victims alive, and the very short timeframe in which the murders occurred thereafter. The trial court, after reviewing a redacted affidavit, agreed with the state and denied the motion.

Defendant sought supervisory writs on both rulings, which this Court ultimately denied. *State v. Turner*, 12-2030 (La. 1/11/13), 106 So. 3d 554.

While the writ application was pending before this Court, the defense filed a supplemental motion to suppress, alleging the state intentionally misrepresented information contained in the search warrant affidavit. The trial court held an additional hearing on defendant's motion to suppress on January 9, 2013.[5] As set forth in detail below, Detective Locicero testified that he prepared the affidavit accompanying the application for the search warrant of Turner's residence and that the affidavit contained information that a vehicle matching the description of Turner's vehicle was seen "circling" the block on which the Carquest was located three times after 3:00 p.m. Though Detective Locicero did not view the video, Baton Rouge City Police Detective Phillip Chapman did view the footage and testified at the hearing. Chapman, however, could not definitively state whether the vehicle was a BMW, nor could he see a driver or license plate. Defendant argued that, at best,

---

[5] The hearing was continued to February 25, 2013.

11

the video evidence shows three different instances in which a white car drove down a street, not that it was his car. At the conclusion of the hearing, the trial court denied the motion. Defendant applied for supervisory writs, which this Court denied. *State ex rel. Turner v. State*, 14-0225 (La. 2/28/14), 134 So. 3d 1182.

After several continuances,[6] jury selection began on April 13, 2015, and concluded on April 29, 2015. Over 150 prospective jurors were examined for death qualification, after which the remaining jurors were subjected to general voir dire. Each side exercised all of its peremptory challenges.[7] Defendant raised eight *Batson v. Kentucky*, 476 U.S. 79 (1986), challenges during voir dire, which the trial court denied. A jury of 12 with two alternates was selected.

Opening statements began on April 30, 2015. The state described how it believed the crime occurred, summarized the evidence it would present, and explained how that evidence established the elements of the crime. The defense urged the jury to hear all of the evidence and consider whether defendant was actually a cold-blooded killer or a young man who made an impulsive mistake, and to be fair and keep an open mind.

The state called 26 witnesses during its case-in-chief, including the victims' wives, investigating officers, crime scene technicians, and experts in the fields of ballistics, DNA comparison, and latent fingerprint analysis. In addition to the portions of the investigation detailed above regarding the interview of Turner and

---

[6] Concerning one of defendant's motions to continue, which was based on funding issues with the public defender board and inability to procure experts, the court of appeal reversed the trial court's denial of the motion to continue. *State v. Turner*, 14-0369 (La. App. 1 Cir. 4/2/14).

[7] Defendant was granted an additional peremptory challenge (for a total of 13) by the court of appeal when it reversed the trial court's denial of defendant's challenge for cause to potential juror James Walter Green, who was at that time the United States Attorney for the Eastern District of Louisiana. *State v. Turner*, 15-0647 (La. App. 1 Cir. 4/24/15).

events unfolding contemporaneously therewith, the evidence and testimony produced at trial revealed that Turner had visited the Government Street Carquest the day before the murders while Leroy Moore was working. He asked Moore about how deposits were made and if they were handled personally, or if they were handled with the use of an armored truck service. Deputy Jackie Hohense, a latent fingerprint examiner, testified that none of the prints lifted from the crime scene were matched to Turner, and that there were some unidentified prints from the scene without a known match. Amber Madere, another latent print analyst, testified that no latent prints were obtained from the gun recovered from behind the Carquest. Crime scene investigator Amie Genola testified that she attended the autopsies of both victims, and took photographs of their injuries. The state introduced multiple photographs of Mr. Gurtner's body, showing each of 12 bullet wounds, over a defense objection.

Jeff Godeau, the firearms and crime supervisor for the Louisiana State Police Crime Lab, also testified. Mr. Godeau analyzed nine cartridges from the scene, and nine bullets, some from the victims' bodies and some from the scene. He testified that all of the bullets were fired from the .38 caliber firearm found outside the Carquest. The state also called Dr. Bruce Wainer, former forensic pathologist for the East Baton Rouge Parish Coroner's Office. Dr. Wainer explained the nature of the victims' injuries and noted that Mr. Chaney died from a single gunshot wound to the back of his head fired at close range, while Mr. Gurtner was shot 12 times, mostly in the back. The gunshot to Mr. Gurtner's left flank was fatal.

Jeremy Dubois, an expert in forensic DNA analysis, also testified for the state. He testified that he received the clothing that was found in the trashcan outside of defendant's residence and that all the items were negative for the presence of blood. Multiple areas of the store were swabbed for DNA, and of the samples that contained

sufficient material to conduct an analysis, Turner was excluded as a contributor. With respect to the gun found behind the Carquest, a mixture of at least two individuals' DNA was found on the trigger and slide, including that of an unidentified person. Turner could not be excluded as a contributor, though both victims, all Gurtner family members, Mr. Chaney, and Leroy Scales were excluded.

Leroy Moss, defendant's uncle, also testified for the state. He stated that Turner called him on the afternoon of the shootings and thanked him for everything he had done for him. Turner called back later and asked if Leroy had heard about the shootings. Melanie Williams, defendant's girlfriend at the time of the shootings and mother of defendant's child, also testified. She stated that Turner picked her up on the afternoon of March 27, 2011, around 3:30 or 4:00 p.m., and that they ran errands and ate at Applebee's. Turner later dropped her off at her parents' house, and eventually called her later that night and seemed "sorry for what happened" and "nervous" about what had happened at Carquest. He did not admit to Melanie that he was involved in the shootings. Melanie also spoke to Turner the next morning while he was on his way to work and he seemed normal. She testified that she knew Turner to carry a gun.

The state also played for the jury the 911 call made by Elizabeth Gurtner upon finding her husband's body, and the 11-hour video of Turner's interview/confession.

The defense did not present any witnesses during the guilt phase and rested on May 4, 2015.

In closing, the state argued that the evidence proved that Turner murdered two innocent victims in cold blood, all because of greed for money. The defense presented a short closing argument, urging the jury to find that Turner did not plan the murders and that they were the result of an impulse of a desperate man. As such,

14

the defense argued, responsive verdicts of second degree murder were appropriate. On rebuttal, the state argued that the murders were motivated by pure greed and committed in cold blood, and that the jury should return verdicts of guilty as charged. Later that day, the jury found Turner guilty as charged of two counts of first degree murder.

The penalty phase began on May 5, 2015. The state presented victim impact testimony through six witnesses: the wives of both victims; Mr. Gurtner's son; and Mr. Chaney's stepfather, son, and daughter.

The defense called four former teachers/coaches of defendant; the father of one of defendant's ex-girlfriends; Warden Grimes from the East Baton Rouge Parish Prison; prison/inmate classification expert Jim Aiken; and 11 different current or former relatives of defendant, including defendant's older brother, Demarcus Moss, his mother, Melissa Moss, his father, Lee Turner, Sr., and his maternal grandmother, Debra Gilbert. Generally, the teachers and coaches described Turner as a quiet and reserved child with a talent for drawing. Warden Grimes described the faith-based program in which Turner was involved, and noted that he had no disciplinary "write-ups" during the years he had been in custody at the parish prison. Mr. Aiken testified that Turner was a "compliant inmate" and took well to the structure of prison; he further testified that Turner could be safely maintained in a prison like Angola.

Defendant's family members detailed his tumultuous childhood. Defendant's father was largely absent from his early life, and he was raised primarily by his mother, Melissa Moss. Melissa suffered from mental health issues, and tried to kill herself when she was eight months pregnant with defendant by jumping into a pool.[8]

---

[8] She was rescued and no physical harm was apparently done to Melissa or her unborn child.

She had a series of boyfriends throughout Turner's childhood, some of whom were abusive to her, often in Turner's presence. Melissa also on occasion both verbally and physically abused and was neglectful of Turner.

Relatives stated that Melissa could be a good mother at times, but put her children second whenever there was a man in her life, which was often. Turner's aunt explained that the children of any current man in Melissa's life were favored, while the other children were pushed aside. Turner also took on a parental role for his younger siblings, even though he was young himself. Due to these increased responsibilities, according to relatives, he had little time to truly have a childhood.

Defense counsel also presented Dr. Mark Cunningham, a clinical and forensic psychologist, who gave lengthy testimony. He generally opined that Turner suffered from adverse developmental factors and transgenerational dysfunction resulting from the unsteady and often un-nurturing environment in which he was raised.

Closing arguments in the penalty phase occurred on May 8, 2015. The state focused on the innocence of the victims, the impact their deaths had on their families, and the callousness of defendant's actions. The state urged the jury not to show defendant any mercy, because he had not given the victims that courtesy. The defense urged the jury to see defendant as a person and to find a place in their hearts to spare his life and show him mercy. The defense highlighted defendant's lack of prior criminal history, his clean disciplinary record while in prison, and the frailties of his life.

The state responded by wondering aloud if Mr. Gurtner begged for his life, like Turner's defense was doing now. The state again argued that defendant showed his victims no mercy or compassion, and thus neither should the jury show him any.

16

Later that day, the jury returned sentences of death, having found the aggravating factors of creating a risk of death to more than one person and engaging in the perpetration of or attempted armed robbery both proven beyond a reasonable doubt. Defendant filed a motion for new trial, arguing several issues, which he urges again in this appeal, as well as others not raised here, including several allegations of prosecutorial misconduct. The court denied the motion and all claims raised therein. Immediately thereafter, Turner waived his sentencing delay, and the court sentenced him to death by lethal injection. Turner timely filed this appeal.

## ARGUMENTS

We now discuss the defendant's assignments of error.

### VOIR DIRE ASSIGNMENTS OF ERROR

*Assignment of Error No. 1*

Defendant argues he was denied his constitutionally protected rights to a full voir dire when, in the middle of voir dire, the trial court issued a ruling that prevented defense counsel from inquiring into prospective jurors' ability to fairly consider voting for a life sentence in a case involving a double murder committed during the course of an armed robbery. We agree with the defendant based on the facts of this case, and reverse his sentences of death. For the reasons explained below, his convictions are upheld.

The purpose of voir dire is to determine the qualifications of prospective jurors by testing their competency and impartiality and to assist counsel in articulating intelligent reasons for exercising cause and peremptory challenges. *State v. Stacy*, 96-0221, p. 5 (La. 10/15/96), 680 So. 2d 1175, 1178. The standard for determining whether a prospective juror may be excluded for cause because of his views on capital punishment is whether his views would "prevent or substantially impair the

17

performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). *See Witherspoon v. Illinois*, 391 U.S. 510 (1968) (holding that a prospective juror who would vote automatically for a life sentence is properly excluded); *State v. Sullivan*, 596 So. 2d 177 (La. 1992), *rev'd on other grounds*, *Sullivan v. Louisiana*, 508 U.S. 275 (1993).

In a "reverse-*Witherspoon*" context, "a potential juror who indicates that he will not consider a life sentence and that he will automatically vote for the death penalty under the factual circumstances of the case before him is subject to a challenge for cause by the defendant." *State v. Robertson*, 92-2660 (La. 1/14/94), 630 So. 2d 1278, 1284. *See Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992) (holding that venire members who would automatically vote for the death penalty must be excluded for cause, reasoning that any prospective juror who would automatically vote for death would "fail in good faith to consider the aggravating and mitigating circumstances," and thus violate the impartiality requirement of the Due Process Clause).[9] This is because jurors who cannot consider both a life sentence and a death sentence are "not impartial," and cannot "accept the law as given . . . by the court." La. C.Cr.P. art. 797(2),(4); *State v. Maxie*, 93-2158, p. 16 (La. 4/10/95), 653 So. 2d 526, 534-35. In other words, if a prospective juror's views on the death penalty, as indicated by the totality of his responses, would "prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths," whether those views are for or against the death penalty, he or she should be excused for cause. *State v. Taylor*, 99-1311, p. 8 (La. 1/17/01), 781 So. 2d 1205, 1214; *State v. Hallal*, 557 So. 2d 1388, 1389-90 (La. 1990).

---

[9] The "substantial impairment" standard also applies to reverse-*Witherspoon* challenges. *Morgan*, 504 U.S. at 732.

Although the accused is entitled to full and complete voir dire, La. Const. art. I, § 17, the scope of counsel's examination rests within the discretion of the trial judge, and voir dire rulings will not be disturbed on appeal absent abuse of that discretion. La. C.Cr.P. art. 786; *State v. Robertson*, 92-2660 (La. 1/14/94), 630 So. 2d 1278, 1281. The right to a full voir dire does not afford the defendant "unlimited inquiry" into possible prejudices of prospective jurors, *i.e.*, their opinions on evidence or its weight, hypothetical questions, or questions of law that call for prejudgment of facts in the case. *State v. Ball*, 00-2277, p. 23 (La. 1/25/02), 824 So. 2d 1089, 1110. Louisiana law provides that a party interviewing a prospective juror may not ask a question or pose a hypothetical that would demand the juror's pre-commitment or prejudgment as to issues to be resolved in the case. *Id.*; *see also*, *e.g.*, *State v. Williams*, 89 So. 2d 898, 905 (La. 1956) ("It is not proper for counsel to interrogate prospective jurors concerning their reaction to evidence which might be received at trial."); *State v. Smith*, 45 So. 2d 617, 618-19 (La. 1950) ("[H]ypothetical questions and questions of law are not permitted in the examination of jurors which call for a pre-judgment of any supposed case on the facts.").

This Court's jurisprudence therefore provides that counsel may not detail the circumstances of the case and then ask jurors to commit themselves to a particular verdict in advance of trial. However, a prospective juror must know enough about the circumstances of the case to indicate whether he or she will be able to return a sentence of death. *State v. Coleman*, 2014-0402 (La. 2/26/16), 188 So. 3d 174, 208-09, *cert. denied*, 137 S. Ct. 153 (2016). If a juror is not able to return a sentence of death, he or she is not competent to sit as a capital juror, even where the juror may also express an abstract or theoretical ability to consider both death and life sentences. *Id.* (citing *State v. Williams*, 96-1023, p.11 (La. 1/21/98), 708 So. 2d 703,

714).[10] Thus, while seeking to elicit whether a prospective juror is capable of remaining impartial in the case at hand, counsel must maintain a careful balance of providing jurors with enough information to indicate whether they can return a sentence of death, but not enough that it becomes a "pre-commitment" to a particular outcome.

In order to understand the trial court's erroneous ruling here, an examination of the larger context of voir dire is required. The voir dire process was extensive, consisting of more than 150 jurors questioned over 13 days. The trial court conducted voir dire with an unusual structure. Death qualification of juror panels was interspersed with general voir dire of remaining jurors. After panels 1-3 were death-qualified, there was one panel of general voir dire with the jurors from those panels who had not been excused for cause. The process repeated with panels 4-9, 10-11, and panel 12.

On the sixth day of voir dire, during death-qualification of panel 6 and the individual questioning of prospective juror Joette Leblanc, defense counsel posed the following hypothetical and the received the following answers:

> Q:   Going back to that hypothetical case where someone has intentionally killed two completely innocent victims during an armed robbery. He wanted to kill not just one but two completely innocent victims. No defenses whatsoever. He was old enough. He was an adult. He knew right from wrong. In that case, under those circumstances, from what I hear you saying is that the death penalty is the only appropriate penalty for you, for you. Is that fair?
>
> A:   Yes.

---

[10] In *Williams*, this Court held: "We, like our sister states who have addressed the issue, hold that when a potential juror indicates his or her attitude regarding the mitigating circumstances would substantially impair his or her ability to return the death penalty, then that juror is properly excludable for cause." *Williams*, 96-1023, pp. 8-10, 708 So. 2d at 712-14. The Court further found that two prospective jurors who initially indicated theoretical support for the death penalty could not have returned a death verdict because of the defendant's age and were therefore unfit to serve on the capital jury in that case. *Id.*

Q: And that life without parole, in that circumstance, is not enough punishment. Is that fair?

A: Yes.

The state objected to defense counsel's questioning, and a bench conference occurred. The state argued defense counsel was "requiring a commitment" from the jurors, and was doing so after presenting "the worst possible scenario with no mitigation" to jurors. The state continued: "He's boxing them in to saying this is what I'm going to do and then trying to use it to get people for cause. So I guess my objection is with Ms. Leblanc and future voir dire."

Defense counsel responded, arguing that this Court's decision in *Robertson* allows questioning concerning "category-specific cases." The court eventually concluded that more discussion of *Robertson* was necessary, and that they would proceed with Ms. Leblanc's questioning but then take a break. The state attempted to rehabilitate Ms. Leblanc, after which defense counsel challenged her for cause, and argued that "Ms. Leblanc will not consider a life sentence in a situation where we have an intentional killing of two completely innocent victims during an armed robbery." The court granted the defense challenge for cause and continued voir dire.

Later that same day, during individual questioning of potential juror Stephanie Jacque (also part of panel 6), defense counsel presented a hypothetical to Ms. Jacque nearly identical to the one posed to Ms. Leblanc quoted above.[11] Ms. Jacque

---

[11] The hypothetical was as follows:

> Let's say you're selected to serve on a hypothetical first degree murder case and you and your fellow jurors in that hypothetical case have considered all the evidence and found that that defendant intentionally killed two completely innocent victims during an armed robbery and you and your fellow jurors have considered any possible defenses but it was not in self-defense. No one forced him to do it. He knew right from wrong. He was an adult. It was not an accident. In that case, in that hypothetical case, what is the appropriate penalty for you? Under those circumstances what is the appropriate penalty for you? You have two choices: life without parole and death penalty.

21

expressed some confusion and, as defense counsel attempted to clarify, the court interrupted to ask, "[A]re you asking her after the chance to hear any mitigating circumstances and aggravating circumstances?" At a bench conference, at the urging of the state, the court instructed defense counsel:

> You need to rephrase it to include the part that if there are any mitigating or aggravating. You don't have to say there will be. But if there was any presented, what would her position be. . . You're asking for a commitment at that point before she hears anything in the penalty phase. Y'all convicted him of this crime, intentional robbery of two people. What is the appropriate penalty . . . You're not getting the question clear that you want an answer before they even consider any other mitigating—evidence of any mitigating circumstances so that they're clear this is not the point they're going to have to decide.

Defense counsel replied that he understood, and Ms. Jacque's voir dire continued; she was ultimately challenged for cause by both sides, and the court granted the challenge. Voir dire continued the rest of the day, largely without incident. At various points, both sides informed potential jurors that the case at hand dealt with two victims killed during an armed robbery.

The following morning (the seventh day of voir dire), before beginning death-qualification voir dire of panel 8, the court issued the following warning:

> I have been thinking about jury selection and how it's going in this case, and I want y'all to know we are not going to go into the facts of this case. We are not going into the facts and then ask them what would you do. That probably is going to affect your hypothetical question. The problem is its confusing to the jurors. They hear all of one side, nothing good. They hear the specific facts of this case, and the fact you say it's a hypothet doesn't mean it's not the facts of this case. . . . but it's asking them to prejudge this case.

Defense counsel responded in part by explaining that his purpose in proposing the hypotheticals was to "make sure they understand how serious it is and how this is an intentional killing." The court then asked for authority that supported counsel's position that, as phrased by the court, "says you're entitled to go into the facts of the

case[.]" After directing the court's attention to *State v. Robertson,*[12] the following exchange took place:

Court:     . . . This is really confusing to the jurors, you put them in the position of being able to deliberate, and all they have is one side, and you're asking them to commit, and you're asking them—

Defense:     When you say commit—

Court:     —Could you consider it, and maybe they are already doing the mental gymnastics in their head, and they deliberated with themselves, and they say, you know what, I think in that case, I think I would have to vote for the death penalty. That's what this—that's what this whole process is about, to consider the facts of the case, everything in the penalty phase, and them come up with the appropriate penalty. The fact that that's [sic] what they come down to, you're asking them to prejudge this case and tell you how they are going to vote in this case; although, it is the worst possible scenario because you're leaving out any mitigating circumstances.

Defense:     Well, the way I deal with mitigating circumstances is after I get their feeling about the death penalty for those circumstances, I ask them would it matter to you that he was young. Would it matter to you that—his background, his childhood.

Court:     I have heard the question over and over. . . . the problem is you're talking about the exact facts of this case. You're asking them to commit. How would you vote. You can call it anything you want. Would you think that's the only appropriate—well, that's the whole purpose when they go back there and deliberate. They figure out what the appropriate penalty for this case is. So you're asking them to jump ahead and put that cart before the horse, as you have been referring to it, and to tell you what they are going to do, based on this worst possible case scenario. . .

Defense:     . . . Again, Your Honor, I'm trying to get not facts of the case so much as I'm trying to get the category, the category of armed robbery and intentional killing of two completely innocent victims.

---

[12] The transcript reads "State versus Robinson." Presumably, based on defense counsel's argument he made the day prior as well as defendant's brief submitted to this Court, defense counsel meant *State v. Robertson*, and thus "*Robinson*" was either a mistake or transcription error.

Court:     . . . I said we are not going to talk about the facts of this case. They already know it's a double homicide.

. . .So [the state] can't tell them the specific facts they are going to prove, and you know, I haven't heard [the state] say cold-blooded, completely innocent victims, and all that stuff, but that applies to everybody. We are not going to discuss the facts. Nobody is going to be allowed to get these jurors to commit or prejudge this case.

The court noted the defense's objection to its ruling, and voir dire resumed.

The issue arose again, however, when defense counsel attempted to include the armed robbery aggravator in questioning potential juror Lisa Sutherland. Defense counsel presented the following hypothetical:

They are telling you it's an armed robbery and two people are dead, and I have been using the example that the guy goes into a bank to steal, rob the bank, and ends up shooting a couple of people. That's the facts, just use that as an example. In that situation, you have been on the jury. You have heard all of the evidence. Y'all decided they proved it beyond a reasonable doubt that it was first degree murder and that you have now voted for first degree, that it happened during an armed robbery, and more than one person was killed. What in that—[interrupted by the state's objection].

After objection, counsel asked the court if "there is another fact pattern you would like me to use instead?" The court responded as follows:

[T]here's nothing that indicates they actually know it's an armed robbery. That's the problem. You are giving them all the facts . . . . And then asking what you're going to do. Is there anything that matters to you? By the way, we haven't even finished issuing subpoenas yet. So tell us what you want to hear, this is not a menu, all right, but the bottom line is you're not allowed to go into the facts of the case. So you're telling them it's a double homicide, which I told them when they came in, they know that. I didn't tell them it's an armed robbery. They haven't gone into the circumstances. So the fact you change it from an autoparts store to a bank is not significant.

. . . .

*Here is the deal. Nobody is allowed to go into the facts. They don't need to know it's an armed robbery. They already know it's a double homicide.* We tell them that—or I tell them that when they come in.

24

> The question is can they fairly consider both possible penalties, weigh all the evidence, weigh the mitigating circumstances, weigh what is presented to them and make a determination and not automatically choose one or the other. (Emphasis added.)

The court noted defendant's objection and the remainder of voir dire for all of the remaining panels (including four more panels of jurors and three more panels of general voir dire) was conducted in accordance with the court's ruling.

Defendant argues that the court erred in prohibiting any reference to the state's allegation of armed robbery and that, as a result, the remainder of defense counsel's voir dire was unduly restricted. ("Here's the deal. Nobody is allowed to go into the facts. They don't need to know it's an armed robbery.") He points out that eight of the jurors ultimately seated were selected after the court's ruling was in place. Moreover, defendant argues that, without the ability to conduct a full voir dire following the court's ruling, he was also unable to intelligently use his remaining peremptory challenges to remove unfavorable jurors, because he was forced to use them to remove jurors who might have otherwise been disqualified for cause had counsel been able to question them concerning their views on the specific category of first degree murder defendant was facing. Defendant argues that the court's ruling and subsequent ramifications amount to reversible error.

We interpret the trial court's ruling in two parts. The first occurred on the afternoon of the sixth day of voir dire and reiterated on the morning of the seventh day. At both of these points, the court primarily seemed to take issue with defense counsel questioning prospective jurors in a way that asked them to pre-judge or commit to a certain outcome by, for example, presenting certain specific facts and then inquiring, "under those circumstances, what is the appropriate penalty for you?" as counsel had done the day before. As the court explained on the morning of the

25

seventh day of voir dire, "[T]he problem is . . . you're asking them to commit. 'How would you vote[?]'" The second part of the ruling came later that day, when the judge took issue with defense counsel's use of one of the state's allegations, namely, armed robbery, in its questioning: "Nobody is allowed to go into the facts. ***They don't need to know it's armed robbery***." (Emphasis added.)

The first part of the court's ruling, instructing defense counsel that he could not present a juror with facts and then ask the juror to pre-commit to a verdict, comports with well-settled jurisprudence of this Court generally disallowing questions which give detailed case-specific facts to the jury and then ask a juror to pre-judge the case. *See, e.g.*, *Ball*, 00-2277, p. 23, 824 So. 2d at 1109-10 (trial court correctly forbids questions the evident purpose of which is to have prospective juror pre-commit himself to certain views of the case).

The second portion of the ruling is where the trial court erred. As this Court explained in *Robertson*:

> [A] potential juror who indicates that he will not consider a life sentence and that he will automatically vote for the death penalty under the factual circumstances of the case before him is subject to a challenge for cause by the defendant. It is irrelevant that the potential juror can conceive of different factual situations where he might consider voting for a life sentence where his unwillingness to consider such a sentence in the case before him is clear.

630 So. 2d at 1284. It logically follows from the plain language of *Robertson*, then, that a defendant is entitled to inquire of a potential juror whether, under the more factual circumstances of the case before her, she would automatically vote for the death penalty. *See, e.g.*, *Morgan*, 504 U.S. at 724 n.3 ("The 'reverse-*Witherspoon*' question may not be the only means of ensuring defendant an impartial jury, but it is certainly the most direct. The best way to ensure that a prospective juror would not automatically vote for the death penalty is to ask.") (citation

26

omitted). The crucial inquiry is the level of specificity permitted in the manner in which the "factual circumstances of the case" are presented to potential jurors, and whether, in this case, the court's ruling improperly curtailed counsel's ability to convey those circumstances.

This Court's decisions in *Ball* and, more recently, *State v. Coleman*, 14-0402 (La. 2/26/16), 188 So. 3d 174, are instructive as to the level of specificity allowed when presenting the factual circumstances of a case to a potential juror during death qualification. In *Coleman*, defense counsel informed potential jurors that the state would present evidence during the penalty phase that Coleman committed a second murder. The state objected, and the trial court sustained the objection. This Court quoted with approval the trial court's reasons for sustaining the objection:

> Now, I will agree with [the defense] that you may ask questions concerning, for example, could you consider imposing a life sentence if the facts show that the homicide was committed during a burglary? That's a permissible question. Could you consider imposing a life sentence if the facts showed that the defendant attempted to kill more than one [person]? That's a permissible question. But you went beyond that when you went on to say that the state is going to introduce at the penalty phase evidence to show that a second murder was committed. That's far beyond the scope[.] . . .
>
> ***[T]he defense and the state will be able to ask questions concerning the general allegations in this case. For example, could you consider a life [sentence] or a death penalty for someone convicted of murder involving a burglary? Could you consider imposing a life [sentence] or a death penalty for someone convicted of a murder involving more than one? Those are permissible questions.*** To go beyond that, particularly when jurors, potential jurors, have consistently shown that they are open to any and all sentences and to go beyond that any [sic] ask questions or pose questions of a prospective juror on specific facts is clearly impermissible under Louisiana law and federal law.

*Coleman*, 14-0402, pp. 43-44, 188 So. 3d at 208 (emphasis added) (quoting Crichton, J., then-trial court judge).[13]

---

[13] The defendant's death sentence was vacated on other grounds. *See Coleman*, 14-0402, pp. 78-80, 188 So. 3d at 229-230.

This Court's decision in *Ball* also drew a distinction between counsel presenting jurors with a permissible "one or two circumstances which might play a critical role in the trial" on the one hand, and, on the other, presenting a detailed "narrative summary of what the undisputed evidence would show at trial." 00-2277, p. 23, 824 So. 2d at 1110. The *Ball* Court noted that the more descriptive and detailed the narrative summary, the more likely counsel will run afoul of this Court's general rule barring pre-commitment of jurors to a particular result when counsel then asks whether they would "consider" reaching that result. *Id*. The detailed narrative summary that defense counsel used in *Ball* and which the majority found problematic is illustrative of questioning that is not permissible: counsel presented to each death qualification panel the elements of first degree murder as charged, specifically, that defendant was charged with killing the victim, not as an accident, but as an intentional act during an armed robbery of a barroom, disclosing that the victim, a Budweiser beer distributor, coincidentally arrived at the bar during the robbery, and courageously intervened when he was shot. *Id*. at 1104, n.12. The level of case-specific detail used by defense counsel in *Ball* is well beyond what defense counsel here presented to the jurors.

The trial court's ruling in this case categorically prohibiting counsel from referencing armed robbery to the jury runs afoul of *Coleman* and *Ball*. The general allegations of the case at hand necessarily included the fact that there were two victims and that the victims were killed during an armed robbery. Indeed, these were the exact statutory aggravators set forth in the state's notice of intent to seek the death penalty. *See* R.S. 14:30(A)(1), (3). As such, a question posed to potential jurors that included a reference to the charged element of armed robbery would comport with the permissible questions quoted above in *Coleman*. Likewise, a general

28

reference to armed robbery does not come near the level of detail the Court found problematic in the extensive narrative summary in *Ball*. The trial court's blanket prohibition against referencing armed robbery was therefore an abuse of discretion.

Notably, the court's erroneous ruling came in response to a question posed by defense counsel that was also arguably improper, at least insofar as it called for the juror's pre-commitment to a verdict in response to an overly specific statement of facts. Defense counsel's question that prompted the court's ruling asked the jury to consider a set of facts where "a guy goes into a bank to steal, rob the bank, and ends up shooting a couple of people. That's the facts, just use that as an example." This presentation of facts is more specific than the questions approved of in *Coleman*, though not as detailed as the narrative this Court found improper in *Ball*. However, instead of merely sustaining an objection to the overbroad nature of defense counsel's hypothetical, the court overcorrected when it prohibited ***any*** reference that might inform the jury that the state alleged defendant committed the double murders during the course of an armed robbery.

Defendant argues that the court's ruling rendered his right to a "full and complete voir dire" unconstitutionally inadequate, and points to juror Sherri Harris as an example of an unqualified juror being seated. Defense counsel asked Ms. Harris about one of the answers on her questionnaire that indicated she felt the death penalty was appropriate in certain cases. She stated:

> In a case where someone is defenseless like a child or an elderly person or something like that or something just totally violent, I would not—I mean, honestly if it's something horrendous, there's not even a reason for a trial. In my mind I already have a decision made that that is not a good choice for that person's life. . . .
>
> But in a child or an elderly person or something like that, someone that totally is innocent and defenseless, then there's no questions asked.

Upon further questioning, she reiterated: "I just think there are some crimes that are so horrendous that [they] should just automatically get the death penalty." In response to the state attempting to revisit some of her answers, Ms. Harris noted that she would likely be for "automatic death in cases that are very violent, in children, and ***blah, blah, blah, you know***." (Emphasis added.) At the conclusion of questioning, neither side challenged Ms. Harris.

Defendant's argument that he was unable to effectively question Ms. Harris during her death-qualification voir dire is persuasive. Ms. Harris made clear that she felt some crimes automatically deserved the death penalty, particularly very violent crimes and those involving children, and, to use her own words, "blah, blah, blah, you know." Because the trial court ruling prevented defendant from asking whether a double homicide committed in the course of an armed robbery was one of those crimes, defendant could not discern whether Ms. Harris would automatically vote for the death penalty under the circumstances before her. In other words, the defense could not ask whether armed robbery was one of the "blah, blah, blahs" circumstances to which Ms. Harris was referring. *See Morgan*, 504 U.S. at 724 n.3 ("The 'reverse-*Witherspoon*' question may not be the only means of ensuring defendant an impartial jury, but it is certainly the most direct. The best way to ensure that a prospective juror would not automatically vote for the death penalty is to ask.") (citation omitted). Ultimately, neither side challenged Ms. Harris and she was seated as a juror. Thus, defendant's jury included at least one juror who, when presented with the factual circumstances of his case, might automatically vote for death.[14]

---

[14] Defendant makes a similar argument in his supplemental brief regarding seated jurors Ashley Andrews and Patricia Borskey. During voir dire, Ms. Andrews testified that she would automatically vote for the death penalty for "certain crime[s]." She further stated that she "wouldn't just impose the death penalty for any crime. It would have to be a certain crime . . . [a] certain circumstance." Because of the trial court's ruling, defendant was unable to inquire if armed

The state responds to defendant's argument by asserting that the trial court's ruling is consistent with jurisprudence that prevents counsel from "going into the facts and then asking jurors for a commitment." As discussed above, however, informing potential jurors that the state alleges defendant to have committed the double murders during an armed robbery is not an impermissible incursion into the specific "facts" of the case so as to trigger the prohibition on seeking a pre-committal or a prejudgment of the case. The state also notes that all of the selected jurors, even the eight seated after the court's ruling, demonstrated "absolute neutrality as to their application of the death penalty." While it is true that most jurors, when presented with the more generalized questions of whether they could be impartial and follow the law, answered in the affirmative, "this [C]ourt has rejected the contention that unjustified restrictions on voir dire can be cured by a response on the part of a prospective juror that he will follow the law as given to him by the judge when the juror is unaware of the complexity of the law and where that law involves such a basic right of the defendant." *State v. Hall*, 616 So. 2d 664, 669 (La.1993) (citing *State v. Lee*, 559 So. 2d 1310, 1316 (La. 1990); *State v. Brumley*, 320 So. 2d 129 (La. 1975)).

robbery combined with double homicide was one of the "certain crimes" to which Ms. Andrews referred. Though this situation is not as stark as Ms. Harris's "blah, blah, blah," defense counsel may be correct that the one clarifying question they were prohibited from asking by the trial court's ruling is the question that could have made a difference in determining whether Ms. Andrews would automatically vote for death in these circumstances.

The situation with Ms. Borskey is different. Defendant challenged Ms. Borskey for cause, arguing that she could not take into account mitigating factors and based upon the fact that her son was murdered. The trial court focused on the murder, noting that "[Ms. Borskey] knows that doesn't have anything whatsoever to do with this case" and pointing out that her answers did not indicate the murder would "even come into play" in her decision-making. The court further focused on Ms. Borskey's comments regarding mitigating factors, indicating she would "consider everything that's presented to her and make a decision that she thinks is fair, because, in her words, this is dealing with a person's life." Thus, the cause challenge as to Ms. Borskey appears primarily related to the murder of her son, and only secondarily to the mitigating factors in the *Morgan-Witherspoon* analysis, not the aggravating factors. *See also infra*, Assignment of Error Nos. 3, 4.

Considering the above, the trial court's ruling restricting death-qualification voir dire rendered the voir dire inadequate as to a critical aspect of defendant's case: whether a juror was predisposed to or would automatically vote for the death penalty if he was found guilty as charged. As such, we find that the ruling was error. *See Morgan*, 504 U.S. at 739 ("[T]he inadequacy of voir dire leads us to doubt that petitioner was sentenced to death by a jury empaneled in compliance with the Fourteenth Amendment.") (internal quotation marks omitted).

***Remedy*.** Defendant argues that the curtailing of his voir dire requires reversal of both his sentences and his convictions. For the reasons that follow, we disagree, finding the error requires only reversal of defendant's sentences of death.

As an initial matter, federal law requires reversal of defendant's sentences in the context of a *Morgan*/*Witherspoon* error. *See Witherspoon*, 391 U.S. at 521-22 ("[W]e hold that ***a sentence of death cannot be carried out*** if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.") (emphasis added);[15] *Morgan*, 504 U.S. at 729 ("[B]ased on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views [of voting automatically for the death penalty]. If even one such juror is empaneled and the death sentence is

---

[15] In declining to overturn the conviction, the *Witherspoon* Court explained:

> We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, ***we are not prepared to announce a per se constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was***.

391 U.S. at 517-18 (emphasis added).

imposed, ***the State is disentitled to execute the sentence***.") (emphasis added). Because we found the trial court erred in curtailing death-qualification questioning in violation of *Witherspoon*, *Morgan*, and Louisiana jurisprudence, we likewise find the sentences must be reversed.

Defendant argues that the Louisiana Constitution requires more. Specifically, La. Const. art. I, § 17 gives the accused "a right to full dire examination of prospective jurors and to challenge jurors peremptorily." *See also State v. Divers*, 94-0756 (La. 9/5/96), 681 So. 2d 320, 323 ("An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error."); *State v. Taylor,* 03-1834 (La. 5/25/04), 875 So. 2d 58, 62 (same); *State v. Ball*, 00-2277 (La. 1/25/02), 824 So. 2d 1089 (same). This right to "full voir dire" has been interpreted broadly. In *State v. Boen*, the Court stated: "The [i]ntelligent exercise of the right of rejection, by use of those twelve peremptory challenges, is the meat of the privilege, and can be substantially weakened by a restriction of questions the answers to which might be regarded as informative of a juror's attitude and therefore of vital importance to his defense." 362 So. 2d 519, 521 (La. 1978). *See also State v. Williams*, 457 So. 2d 610 (La. 1984) ("The purpose of voir dire examination is to determine the qualifications of prospective jurors by testing their competency and impartiality. It is designed to discover bases for challenges for cause and to secure information for an intelligent exercise of peremptory challenges."). The converse of this is that peremptory challenges exercised unintelligently do not fulfill the criminal defendant's right to full use of each peremptory challenge allotted to him.

Defendant claims that he was prohibited from intelligently using his peremptory challenges because of the trial court ruling. In previous cases where we

have reversed both the conviction and sentence related to death qualification of jurors, the problematic questioning arose out of erroneously denied cause challenges, which required a defendant to exercise a peremptory challenge. As a result, there was a clear record of why the juror should have been excused for cause. For instance, in *Robertson*, defendant argued that the trial judge erred in denying his challenge for cause of a prospective juror, thereby requiring him to exercise a peremptory challenge. 92-2660, 630 So. 2d at 1279. This Court quoted at length the transcript setting forth the colloquy with the prospective juror and why it was clear the cause challenge was erroneously denied. *Id.* at 1281-82. Likewise, in *Maxie*, the defendant similarly claimed an error in denying his challenge for cause, depriving him of the right to use the peremptory challenge on another juror. 93-2158, p. 15, 653 So. 2d at 534. And, as in *Robertson*, the Court quoted at length a transcript making clear the prospective juror should have been challenged for cause.

No such record exists here. Defendant points to four jurors (Mary Johnson, Tammy Salter, Justin McNeely, and Elizabeth Wilson) on whom he used peremptory challenges when "he reasonably feared [those jurors] held disqualifying bias and would have been excusable for cause, if counsel had been able [to] pose the required case specific questions to expose that bias." This argument is conclusory and requires speculation beyond which this Court will engage. Defendant points to no specific response for any juror to indicate he exercised peremptory challenges on them due to the erroneous restriction on voir dire. Instead, our review of the record indicates defendant's challenges to these jurors could have occurred for a variety of reasons unrelated to the reverse-*Witherspoon* error.

Defendant initially challenged Ms. Johnson for cause, but after it was denied, used a peremptory challenge to remove her. Defense counsel made several

34

arguments to the trial court in challenging Ms. Johnson, none of which involved the issue of aggravating factors. Defense counsel argued to the trial court that Ms. Johnson had a predisposition toward the death penalty. ("[I] clearly said you have heard the case, you found him guilty what are you thinking, and she said the death penalty. She said it twice to me.") Defense counsel also argued that she could not consider two of the mitigating factors, including youth. Further, she had previously served on a capital case in which the jury had decided not to impose the death penalty, although she stated she voted in favor of death as part of the jury. *See also infra*, Assignment of Error Nos. 3, 4.

Prospective juror Ms. Salter's questionnaire indicated a bias in favor of the death penalty. For instance, asked to describe her feelings about imposing the death penalty in a case were a defendant has been convicted of murder, she checked the box: "I am strongly in favor of the death penalty and feel it should be imposed upon conviction of murder, with very few exceptions." She also checked off a box indicating her feeling that the death penalty was used "not often enough," writing: "Someone who plans to kill & carries plan through should suffer the consequences of death. Also, that is one less person society funds to live." Further, when asked whether she would look to the defense counsel to prove the defendant is not guilty, she checked "Yes" and elaborated "That is their job to prove innocence."

Prospective juror Mr. McNeely's questionnaire demonstrated a similar inclination toward the death penalty. As with Ms. Salter, asked to describe his feelings about imposing the death penalty in a case were a defendant has been convicted of murder, he checked the box: "I am strongly in favor of the death penalty and feel it should be imposed upon conviction of murder, with very few exceptions." He also checked boxes that stated: "We are too lenient on criminals; people who

35

break the law deserve harsher punishment"; "The death penalty is the best crime preventative"; "People sentenced to death are not executed quickly enough"; and "People serving life in prison don't really serve for their life, they get out after __ [left blank] years." Other questions could also have led defendant to exercise a peremptory challenge on Mr. McNeely. When asked whether he believed African American males "commit disproportionately more crimes than males of other ethnic groups," he marked "Yes." He also marked "Yes" when asked "In a murder case where the death penalty is being sought by the prosecution, do you believe the accused is more likely to be guilty?"

As to prospective juror Ms. Wilson, defendant's reason for exercising a peremptory challenge on her appears to be entirely unrelated to her opinion on the death penalty and instead related to her status as an attorney. Ms. Wilson initially sought to be recused for hardship, explaining to the court that she is an attorney and had depositions, hearings, and a tentative mediation scheduled for the coming weeks, though she ultimately conceded she could make alternative arrangements. Defense counsel later asked the judge to revisit the hardship issue, stating: "I don't have a challenge for cause, other than what she said about her hardship." In any event, the reasons in the record are scarce, if they exist at all.

In short, defendant points to nothing in the record to demonstrate he was unable to intelligently exercise a peremptory challenge, and thereby lost a peremptory challenge, as a result of the trial court's erroneous ruling restricting voir dire on the aggravating factor of armed robbery. Thus, there was no corresponding violation of the Louisiana Constitution. As such, the trial court's error requires

36

reversal of defendant's death sentences, but does not necessitate a reversal of the convictions under the Louisiana Constitution.[16]

### Assignment of Error No. 2

Defendant asserts that the trial court erred when it failed to remove a juror who the defense challenged for cause, contending that the juror was unable to assure the court that the 1995 murder of her son would prevent her from being impartial.

The grounds for which a juror may be challenged for cause are set out in La. C.Cr.P. art. 797. The relevant ground raised in this assignment of error is if "[t]he juror is not impartial, whatever the cause of his partiality." La. C.Cr.P. art. 797(2). In ruling on a challenge for cause, the trial court is vested with broad discretion and its ruling will be reversed only when the voir dire record *as a whole* reveals an abuse of discretion. *State v. Robertson*, 92-2660 (La. 1/14/94), 630 So. 2d 1278, 1280-81; *State v. Ross*, 623 So. 2d 643, 644 (La. 1993). "[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." *State v. Hallal*, 557 So. 2d 1388, 1389-90 (La. 1990). Reversible error is demonstrated and prejudice is presumed in cases in which a defense challenge for cause was erroneously denied and the defendant ultimately exhausted his peremptory challenges. La. C.Cr.P. art. 799; *Robertson*, 92-2660, pp. 3-4, 630 So. 2d at 1280; *Ross*, 623 So. 2d at 644.[17]

---

[16] Our review of the record also makes clear that any error during death qualification did not infect general voir dire. It is unclear from the record whether the trial court's ruling even extended to general voir dire. And, moreover, there is no significant difference between general voir dire questioning before and after the ruling (*i.e.*, there was no attempt before the ruling to question jurors about the armed robbery aggravator, and no attempt after the ruling either).

[17] This rule is different at the federal level. *See United States v. Martinez-Salazar*, 528 U.S. 304 (2000) (exhaustion of peremptory challenges does not trigger presumption of prejudice arising from district court's erroneous denial of cause challenge). However, at the federal level a defendant may choose whether to exercise a peremptory challenge to cure the error, or to seat the juror and

Here, defendant exhausted his peremptory challenges; thus, he need only show that the trial court abused its discretion when it denied any one of his cause challenges.

In her juror questionnaire, prospective juror Patricia Borskey disclosed that, in 1995, her son was involved in a fight wherein he was punched, fell and hit his head, and ultimately died as a result of his injuries. During voir dire, Ms. Borskey explained the circumstances of her son's death: her son left a restaurant with a group of people, some of whom were white, and some of whom were black. Someone outside the restaurant made a reference to a black girl being with her son's group. Ms. Borskey's son went back to talk to the man, which ultimately resulted in a physical altercation. Her son was "sucker-punched," fell, and hit his head on the street. He was on life support for a week before Ms. Borskey ultimately "let him go." Ms. Borskey further explained that her son was "in with some skin heads," and that there was a truckload of skin heads coming down to kill the man who had punched her son. Knowing this, the man turned himself in, but did not go to trial. Defense counsel first questioned Ms. Borskey concerning whether "the fact that [her] son was killed" would "be a problem" for her. She responded negatively, explaining that "My son's death was a different situation." Defense counsel later questioned Ms. Borskey about her ability to remain impartial; specifically whether, after hearing victim impact testimony, she could still be objective or was going to be "so emotionally tied in this combination with your son?" Ms. Borskey replied, "I'd like to say no, but I really can't answer that question truthfully because I have never done this." She was not questioned further on this topic.

---

then raise the error on appeal if convicted. *Id.* at 315. In Louisiana, however, a defendant must use one of his peremptory challenges curatively to remove the juror, thus reducing his remaining peremptory challenges, or waive any complaint on appeal. *See, e.g., State v. Connolly*, 96-1680, p. 8 (La. 7/1/97), 700 So. 2d 810, 818.

Defendant challenged Ms. Borskey for cause, arguing that Ms. Borskey stated that she would not give weight to certain mitigating circumstances such as education and background, and that she was therefore disqualified for service. Defendant also argued that Ms. Borskey would be unable to remain impartial in light the fact that her son was murdered, which remained "emotional for her." The court denied the challenge, noting that Ms. Borskey went into "great detail" concerning her son's murder, and specifically stated that she knew it had nothing "whatsoever to do with this case." The court further noted that she started out by saying that she could keep an open mind, and that the totality of her answers indicated that she would take this very seriously and consider everything presented to her.

That a prospective juror personally has been the victim of a crime will not necessarily preclude that prospective juror from serving on a jury. *State v. Dorsey*, 10-0216, p. 3 (La. 9/7/11), 74 So. 3d 603, 631. A prospective juror's relationship to a person who was the victim of a crime likewise does not disqualify a prospective juror from serving. *See id.*; *State v. Nix*, 327 So. 2d 301, 326 (La. 1975) (prospective juror's relationship to a murder victim insufficient to establish cause for excusing venireman). Given that Ms. Borskey stated her ability to remain impartial, and to accept and apply the law given by the court, including keeping an open mind and considering everything presented to her, the record does not support defendant's claim that she should have been excused on the basis of her son's murder.

### Assignments of Error Nos. 3, 4

Defendant argues that the trial court erred by denying cause challenges to three prospective jurors who gave answers during voir dire that indicated they were unwilling to consider mitigating evidence or fairly consider mitigating evidence

39

under the circumstances of the case. Defendant also contends that this error deprived him of the right to intelligent exercise of his peremptory challenges.

As discussed above, in ruling on a challenge for cause, the trial court is vested with broad discretion and its ruling will be reversed only when the voir dire record as a whole reveals an abuse of discretion. *Robertson*, 92-2660, 630 So. 2d at 1281; *Ross*, 623 So. 2d at 644. A prospective juror should be excluded if his views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witherspoon*, 391 U.S. 510; *Witt*, 469 U.S. at 424; *Sullivan*, 596 So. 2d 177, *rev'd on other grounds*, 508 U.S. 275. Jurors who cannot consider both a life sentence and a death sentence are "not impartial," and cannot "accept the law as given . . . by the court." La. C.Cr.P. art. 797(2),(4); *Taylor*, 99-1311, p. 8, 781 So. 2d at 1214; *Maxie*, 93-2158, p. 16, 653 So. 2d at 534-35. A trial court's refusal to disqualify a prospective juror does not constitute reversible error or an abuse of discretion if, after further examination or rehabilitation, the juror demonstrates willingness and ability to decide the case fairly according to the law and evidence. *State v. Howard*, 98-0064, p. 7 (La. 4/23/99), 751 So. 2d 783, 795; *Robertson*, 630 So. 2d at 1281. Further, a prospective juror who simply indicates a personal preference for the death penalty need not be stricken for cause. *State v. Tate*, 01-1658, pp. 17-18 (La. 5/20/03), 851 So. 2d 921, 936; *State v. Lucky*, 96-1687, p. 6 (La. 4/13/99), 755 So. 2d 845, 850.

We now turn to a discussion of each of the seated and prospective jurors that defendant challenges in this assignment of error.

**A. Patricia Borskey**

With respect to seated juror Patricia Borskey, in addition to his above argument concerning the murder of Ms. Borskey's son, defendant argues that she

would not give meaningful consideration to evidence about defendant's background offered in mitigation. Defendant specifically points to the following exchange between defense counsel and Ms. Borskey:

> Borskey: I don't know that background and education really matters, because there have been people that were well educated that in the heat of the moment committed a crime, as well as those that have come up rough and hard and didn't get an education that have done the same type of crime. So I don't think, myself, background and education has any sway in it whatsoever.

> Defense: And that would be a mitigating circumstance. So you're saying you could not consider that?

> Borskey: I just don't think it really would sway.

The state then questioned Ms. Borskey further, asking whether she would be willing to consider such evidence. She responded that she would be "willing to hear it, be willing to consider it, but how much it weighs, you know, against one way or the other would be something I'd have to really put a lot of thought into."

Despite defendant's assertions to the contrary, Ms. Borskey clearly stated that she would consider such mitigating evidence, but that she was not sure how much weight it would carry for her. The fact that a juror may not give as much weight to some mitigating circumstances as a defendant would have liked is not an indication of her unsuitability for service. *Coleman*, 14-0402, p. 63, 188 So. 3d at 219; *see also* La. C.Cr.P. art. 797. Defendant shows no error in the trial court's denial of his challenge for cause to Ms. Borskey.

### B. Mary Johnson

Defendant argues that prospective juror Mary Johnson had a disqualifying predisposition toward the death penalty and testified that she would not consider youth as a mitigating factor. Defendant notes that although Ms. Johnson initially responded that she could keep an open mind, she later stated that she would be

predisposed to the death penalty after finding a defendant guilty of intentionally killing more than one person, and she could not consider youth or intoxication in mitigation. Defendant used a peremptory challenge to remove Ms. Johnson.

Ms. Johnson first explained that she had previously served on a jury in a capital case in which the jury had decided not to impose the death penalty, although she voted in favor of death. She further stated that despite that experience, she could keep an open mind about this case and she saw no reason why she could not give both sides a fair chance. Upon questioning by defense counsel concerning whether she would be predisposed toward the death penalty if defendant were found guilty of first degree murder with more than one victim, she replied "not necessarily" and that "it would be dependent on what all was throughout the trial." Upon defense counsel's rephrasing of the question to indicate the evidentiary/guilt phase of the trial would be over at that point, Ms. Johnson responded she would "probably" be predisposed to the death penalty, but she could also consider mitigating circumstances. When specifically asked if she could consider age, however, Ms. Johnson responded, "No." Defense counsel ended questioning by asking, again, whether Ms. Johnson would be predisposed to the death penalty, to which she answered "probably, yes."

The state redirected, and asked whether, just based on a finding of guilty, Ms. Johnson would "necessarily" impose the death penalty, to which she replied, "no, not necessarily." She further confirmed that she would give meaningful consideration to the age of the offender despite her previous answer to defense counsel. Upon follow-up questioning from defense counsel, Ms. Johnson again stated that if defendant was found guilty of first degree murder involving more than

42

one victim, she would "probably" be predisposed to the death penalty but she would need more facts, and that she is predisposed to the death penalty "most of the time."

Defendant challenged Ms. Johnson for cause, arguing that she was predisposed to the death penalty and would not consider two mitigating circumstances. The court denied the challenge, and found that the only time she said she was predisposed was when defendant "gave her the worst possible case scenario[.]"

Ms. Johnson's answers, while somewhat contradictory, did not rise to the level of indicating that she would not be able to remain fair and impartial. After the law was more fully explained to her, she confirmed she would consider the mitigating circumstances and would keep an open mind. As noted above, a prospective juror who simply indicates a personal preference for the death penalty need not be stricken for cause. *Tate*, 01-1658, pp. 17-18, 851 So. 2d at 936; *Lucky*, 96-1687, p. 6, 755 So. 2d at 850. Considering all the above, defendant fails to show the trial court abused its discretion in denying this challenge for cause.

### C. Sean Singleton

Defendant argues that the trial court erred in denying his challenge for cause to prospective juror Sean Singleton, because his answers indicated that his views on capital punishment substantially impaired his ability to follow the law and give meaningful consideration to mitigation, including defendant's youth. Defendant used a peremptory challenge to remove Mr. Singleton.

Defense counsel asked Mr. Singleton if it would be important to him to consider the age of the offender in determining whether to vote for life or death. Mr. Singleton replied, "No. No. The age is not—no, no, that's not. That's not a determinant for me, no. The age hasn't anything to do with it." The state then

43

questioned Mr. Singleton again, and, after informing him that he would have to meaningfully consider all enumerated mitigating circumstances, Mr. Singleton acknowledged he would consider and weigh all of the circumstances along with all of the other facts of the case. Specifically with respect to age, Mr. Singleton replied that "Of course, I would consider it. . . . I'll consider it but I'm just not going to let that just be my final, you know, just that helps me to make my mind up." Defense counsel followed-up with Mr. Singleton asking whether he could "honestly consider age, as a reason to spare the life?" Mr. Singleton replied that he could put that "into the equation" and that he would definitely consider it and do so without hesitation.

After Mr. Singleton became aware that the law required him to give meaningful consideration to all mitigating circumstances, his answers clearly indicate a willingness to consider the age of the offender in determining whether to impose a life sentence or the death penalty. In denying defendant's challenge for cause, the trial court stated: "[H]e said he would listen to everything. He did say he would consider the age. He would consider all of that. Based on his answers as a whole I deny the challenge."

The record supports the trial court's reasons for denying these challenges, and defendant shows no abuse of discretion in the trial court's denial of this challenge for cause. Accordingly, there is likewise no error with respect to defendant's right to the intelligent exercise of his peremptory challenges as to these jurors.

### Assignment of Error No. 5

Defendant argues that the trial court committed reversible error when it granted three state challenges for cause to three prospective jurors who disapproved of the death penalty, despite voir dire testimony from the excused jurors demonstrating that they could vote for either life imprisonment or the death penalty.

44

La. C.Cr.P. art. 798,[18] which governs cause challenges made by the state, was drafted to conform to the constitutional requirements of *Witherspoon v. Illinois*, *supra*, which held that a prospective juror who would vote automatically for a life sentence is properly excluded. The basis of exclusion under La. C.Cr.P. art. 798(2)(b), which incorporates the *Witherspoon* standard, as clarified by *Witt*, is that the juror's views "would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath." 469 U.S. at 424. *Witherspoon* further dictates that a capital defendant's rights under the Sixth and Fourteenth Amendments to an impartial jury prohibits the exclusion of prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.*, 391 U.S. at 522-23.

We will now discuss each of the prospective jurors that defendant challenges.

**A. Karla Kiper**

Ms. Kiper, in response to initial questioning by the court, stated that she was not sure whether she could fairly consider imposing the death penalty due to her moral and religious feelings concerning the death penalty. In response from questioning by the state, Ms. Kiper further stated that she "would want to stay away

---

[18] La.C.Cr.P. art. 798 provides, in pertinent part:

It is good cause for challenge on the part of the state, but not on the part of the defendant, that: . . . .

(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it known:

(a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;

(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; or

(c) That his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt[.]

from the death penalty," and that in her mind the state "would be at a disadvantage because [she doesn't] know if [she] could vote for someone to go to the death penalty." She further confirmed that she was philosophically opposed to the death penalty, and reiterated this throughout the remainder of the state's questioning, as well as during defense counsel's questioning.

Despite this, defendant argues that Ms. Kiper's answers on her juror questionnaire were much less definitive on the issue. She gave examples in her questionnaire of when she felt the death penalty would be appropriate, and included "when the crimes are planned, very violent, and when perpetrators demonstrate no remorse or regard for life."

The state challenged Ms. Kiper for cause, and the court granted the state's challenge. The court noted that although her questionnaire answers and her in-court testimony varied a great deal, Ms. Kiper stated that she had thought a lot about it since she filled out the questionnaire. The court also noted that her body language and discussion of her moral, religious and philosophical feelings against the death penalty all implied that she would be substantially impaired in making that decision.

Although Ms. Kiper's questionnaire answers are slightly less conclusive than her subsequent in-court statements, the record as a whole supports the trial court's ruling. Notably, the court considered Ms. Kiper's body language as one factor in determining that she would be substantially impaired in making a decision in the penalty phase, and defendant does not show that the trial court abused its discretion in granting the state's challenge. *See*, *e.g.*, *State v. Wessinger*, 98-1234 (La. 5/28/99), 736 So. 2d 162, 176, (no abuse of discretion in granting challenge to juror who showed "obvious discomfort at the mere thought of possibly having to consider

46

imposing the death penalty on another human being" because answers show that her

beliefs could indeed "substantially impair" her from fulfilling her duties as a juror).

**B. Sakina Browder**

Defendant argues that Ms. Browder would have readily imposed the death penalty in many types of cases, and that she testified she would consider it in the type of case at bar. As such, defendant argues that the trial court erroneously granted the state's challenge for cause with respect to Ms. Browder.

During the court's initial questioning of Ms. Browder, she stated: "I could consider both, but I don't think it's my place to decide if somebody live[s] or die[s]." When the court asked if she could consider the death penalty, she replied "I don't think I could. . . . No." She then qualified that answer to explain that she does not think she could consider the death penalty "unless it was dealing with a child or something. But other than that, no, I don't think I could." Ms. Browder never significantly wavered from this view throughout the state and the defense's questioning. She clarified that although she told defense counsel she would consider the death penalty, she would listen to the evidence but would not actually vote for the death penalty.

The trial court granted the state's challenge for cause as to Ms. Browder, noting that although she did say that she could listen to everything, "[t]he bottom line is she said she could never vote for the death penalty." The court's ruling is supported by the record, and because Ms. Browder indicated that she would automatically vote for a life sentence except in cases dealing with children or elderly victims, the trial court did not err in granting the state's challenge for cause with respect to Ms. Browder. La. C.Cr.P. art. 798(2)(a); *Witherspoon*, *supra*.

**C. Karen Allen**

Ms. Allen engaged in an in-depth discussion regarding her views on capital punishment. During the court's questioning, Ms. Allen stated that something she has

often said in her life is that she is "not someone's judge or jury," and that she would "potentially" be an automatic vote for a life sentence. During the state's questioning, she explained that she is Catholic and worked for a Catholic-based healthcare organization. She further stated that her work and religion would potentially prevent her from returning a death sentence. Upon further questioning, Ms. Allen stated that she did not know if she could vote for the death penalty. Defense counsel then questioned Ms. Allen, and in response to the question of whether she could consider both the death penalty and life without parole, she responded, "Consider both of those? Yes." Immediately thereafter, however, when asked if she could vote for the death penalty if she felt like it was appropriate, Ms. Allen responded that she was not sure. The court then asked Ms. Allen one final question: "Would your beliefs substantially impair you in making that decision?" to which Ms. Allen replied, "I think because of my own experiences as a child, I really think so."

The state challenged Ms. Allen for cause, arguing that she would be substantially impaired from voting for the death penalty. Defense counsel countered by arguing that her religious views were not a reason to disqualify her from service. The court responded and granted the challenge, giving the following reasons:

> [La.C.Cr.P. art. 798] thinks [religious views] is [a reason for disqualification] when they put in there that's one of the reasons for a challenge for cause, if their views would substantially impair them from making an impartial decision. I mean, that's what all these other questions are trying to get to. After listening to all the other answers— and every question—I know it doesn't show up on the record because it's just a transcript. She was really struggling with her answers on that, bending over backwards to make sure that she answered it correctly, according to what she believed. That's the impression I got from it. And she specifically told me that she thought it would substantially impair her. She also explained some of the reasons why. She's Catholic. She works for a Catholic charity—or not charity but a healthcare organization. And I believe her answers. And based on all of them, I grant that challenge.

49

The record shows that Ms. Allen was uncomfortable with the death penalty, and repeatedly stated that she was very unsure if she could vote for the death penalty. Moreover, the trial court appears to have, in part, relied on its own observations of Ms. Allen's body language, which is impossible to glean from a transcript. The totality of her answers supports the court's finding that Ms. Allen's beliefs would substantially impair her ability to be impartial, and defendant fails to show that the court abused its discretion in granting this challenge. La.C.Cr.P. art. 798(2)(b); *see Wessinger*, 98-1234, 736 So. 2d at 176.

### Assignments of Error Nos. 6, 7

In these assignments of error, defendant argues the state impermissibly struck seven black potential jurors based upon their race. As a result, he argues, although the parish is nearly 50% black, only two black people served on the jury in this interracial murder case. Defendant raised *Batson* objections to all seven strikes.

In *Batson v. Kentucky*, 476 U.S. 79, (1986), the Supreme Court held that it is an equal protection violation for the state to exercise its peremptory strikes to remove jurors from the venire panel solely on the basis of the juror's race. *Batson* provides a three-step process to guide courts faced with a claim of racial discrimination in the voir dire process:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Foster v. Chatman*, --- U.S. ---, 136 S. Ct. 1737, 1747 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008)).[19] The burden of persuasion never shifts

---

[19] In certain instances, where the state volunteers race-neutral reasons for its strike, the court may collapse steps one and two of the *Batson* analysis, *see Hernandez v. New York*, 500 U.S. 352

from the opponent of the strike. However, after establishing a prima facie case of racial discrimination, the burden of production shifts to the proponent of the strike to articulate race-neutral reasons for its actions. "The neutral explanation must be one which is clear, reasonable, specific, legitimate and related to the particular case at bar." *State v. Collier*, 553 So.2d 815, 820 (La. 1989) (adopting the holding of *Batson*). If a race-neutral explanation is tendered, the trial court must decide whether the defendant has proven purposeful discrimination. *Purkett v. Elem*, 514 U.S. 765 (1995) (per curiam) (citations omitted). A reviewing court owes the district judge's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 364 (1991); *Batson*, 476 U.S. at 98, n.21 ("Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.").

The race-neutral explanation does not need to be persuasive, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral. *Purkett*, 514 U.S. at 768. The *Hernandez* court explained:

> A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the [party's] explanation, the reason offered will be deemed race neutral.

*Hernandez*, 500 U.S. at 359.

In this case, after questioning over 150 individuals during *Witherspoon* death qualification, 47 panelists remained for general voir dire. Of the 47, 15 were black,

---

(1991); *State v. Green*, 94-0887, p. 25 (La. 5/22/95), 655 So. 2d 272, 288 ("A trial judge's demand that a prosecutor justify his use of peremptory strikes is tantamount to a finding that the defense has produced enough evidence to support an inference of discriminatory purpose.").

two were Hispanic, and 30 were white. These 47 panelists were split into five groups to cover general voir dire topics. Defendant filed a written *Batson* motion after the second round of general voir dire, in which he challenged the state's first six peremptory strikes, five of which were used to exclude black panelists, and one for a Hispanic panelist.[20]

In hearing that motion, the trial court found that the defense had not made a prima facie showing of discriminatory intent, but because "someone else will be looking at this," ordered the state to offer race-neutral reasons anyway. The court heard the state's reasons, found them to be race-neutral, and after hearing rebuttal from defense counsel, denied the challenges.

The state used its seventh peremptory challenge to strike black female Lanell Craig after the third round of general voir dire, and the defense objected pursuant to *Batson*. The court found that defendant failed to make a prima facie showing, pretermitting any further discussion.

Finally, after the fourth round of general voir dire, the state used its eleventh peremptory strike on black male Michael Smith, and defendant again raised a *Batson* objection. Again, the court did not find a prima facie case of discrimination, but still ordered the state to provide a race-neutral reason. The court found the state's reason race neutral, and denied the motion. The seated jury ultimately consisted of nine white jurors, two black jurors, and one Hispanic juror.

Notably, while the presence of one minority juror on the panel does not alone defeat a *Batson* challenge, it remains a relevant circumstance for the court to

---

[20] The state exercised three peremptory strikes after the first round of general voir dire, and three after the second round.

consider in assessing the prosecutor's overall intent. *State v. Duncan*, 99-2615, p. 27 (La. 10/16/01), 802 So. 2d 533, 552.

As an initial matter, with the exception of the *Batson* motion concerning Lanell Craig, the court ordered the state to provide race-neutral reasons for each strike at issue, even though it specifically found that defendant had failed to make a prima facie case. Thus, although the trial court took the position that the *Batson* claims therefore never reached step two in the analysis, the court nevertheless solicited and considered the prosecutor's articulated race-neutral reasons (again, with the exception of Lanell Craig), and, after defense rebuttal, found the state's reasons sufficient and effectively ruled on the ultimate issue of discriminatory intent. Defendant's argument that the trial court erred in failing to find that defendant had made a prima facie showing of discriminatory intent—with the notable exception of Lanell Craig—is therefore moot. *Hernandez*, 500 U.S. at 359; *Green*, 94-0887, p. 25, 655 So. 2d at 288.

Each challenge is discussed below.

**A. Brandi Guidry**

The state used its first peremptory challenge to remove Brandi Guidry, a black female. In her questionnaire, Ms. Guidry indicated that she is an opponent of the death penalty, writing "I do not believe in capital punishment" four times; checking the box next to "I am personally, morally, or religiously opposed to the death penalty and would never vote for the death penalty under any circumstances;" and indicating that she would agree if the legislature abolished the death penalty. Despite these written answers, during the individual death qualification stage, Ms. Guidry backtracked. When asked if she was against capital punishment, she initially responded "I said that because I feel like each party has the opportunity to be heard.

If after I hear the evidence presented in the trial, I may believe in capital punishment. I can go either way." She further indicated that "under the right circumstances," she could vote for the death penalty. Under questioning from defense counsel, she indicated that she had not pre-committed to a penalty. Upon questioning from the court as to what had changed since the time she filled out the questionnaire, Ms. Guidry stated that she did not have any information to persuade her towards imposing the death penalty when she filled out the form and that she would not vote to give someone the death penalty without any information surrounding the case. The state challenged Ms. Guidry for cause on the basis of her answers on the questionnaire. The court denied the challenge because, despite her answers on the form, she stated in court that she would consider everything.

In offering its reasons for striking Ms. Guidry, the state explained that she was adamantly opposed to the death penalty on her questionnaire, citing the multiple times she had written that she did not believe in capital punishment but then had a "complete about-face after reading an article on the internet." The state explained that her drastic change in opinion was the reason for the strike. Though defendant correctly points out that the state erred in asserting that Ms. Guidry attributed her change in heart to an internet article,[21] and asserts that this misrepresentation by the state is further evidence of the state's discriminatory intent, the record supports the state's assertion that it decided to strike Ms. Guidry because of the "about-face" in her stated ability to impose a death sentence.

Defendant further argues that seated white juror Patti Suire also gave answers

---

[21] To the contrary, Ms. Guidry was adamant that nothing in particular sparked the change. It is possible that the state confused this juror with Ms. Malancon, discussed below, who stated that she was concerned about the death penalty in part due to the cost, which she read about in an article.

that differed from her initial questionnaire, and yet the state accepted her. Defendant asserts that this disparate treatment of a similarly situated juror is further evidence of the state's discriminatory intent. A review of the questionnaire and voir dire responses reveals that these jurors were not similarly situated. Ms. Suire's responses on her questionnaire concerning the death penalty were more equivocal than Ms. Guidry's. Whereas Ms. Guidry was adamantly (and repeatedly) opposed to the death penalty in her questionnaire, Ms. Suire indicated she was merely "unsure." She responded she was "not sure" of her opinion concerning the death penalty and the best reasons to impose the penalty; she believed the death penalty was used "appropriately;" and checked the box next to the statement "I am not opposed to the death penalty, but feel it should be used as a punishment for murder in only very special cases." During questioning, Ms. Suire responded that she would not be predisposed to either a life or a death sentence, but that she could vote for death and would be "comfortable" making that decision if it came down to it.

Thus, though Ms. Suire seemed somewhat unsure (albeit, supportive of the death penalty) in her responses on the questionnaire, her responses during questioning merely shored up any uneasiness. Unlike Ms. Guidry, Ms. Suire did not display a complete reversal of her beliefs between filling out her questionnaire and answering individual questions during voir dire. Defendant therefore fails to show any disparate treatment of a similarly situated white juror.

In sum, the record supports the notion that Ms. Guidry did in fact have a significant change in opinion between her questionnaire and in-court statements. The totality of Ms. Guidry's responses left the state with questions as to Ms. Guidry's position on the death penalty and whether she could actually vote to impose it. Given that uncertainty, the state's decision to excuse Ms. Guidry peremptorily does not

appear to have been founded on race, and no discriminatory intent appears to have been at play. *See State v. McCoy*, 14-1449, p. 84 (La. 10/19/16), 218 So. 3d 535, 593, *rev'd on other grounds*, *McCoy v. Louisiana*, 16-8255, --- U.S. ---, 138 S. Ct. 1500 (2018). Accordingly, defendant fails to show any *Batson* violation with respect to Ms. Guidry's removal.

**B. Ernest Watson**

The state used its second peremptory challenge to strike Ernest Watson, a black male. In his questionnaire, Mr. Watson left large portions pertaining to the death penalty blank. He did indicate that he felt the death penalty was used unfairly, and that he was personally, morally, or religiously opposed to the death penalty and would have difficulty making an impartial decision about the defendant's guilt or innocence if the death penalty were a possible sentence. During death qualification questioning, Mr. Watson stated that he would consider both the death penalty and a life sentence, and that he would not automatically vote for one or the other; that he felt the death penalty has been used unfairly in "certain cases," though he could not give a particular case; he agreed the death penalty was appropriate in certain cases; he felt that "a person that's incarcerated for the rest of their life, to me that's death anyway;" the death penalty is "kind of let[ting] them off a little bit easier;" he would be more inclined to go with a life sentence, though it would not be automatic either way; a person's youthfulness might sway him towards the death penalty, and he would not consider a person's age as a reason to consider a life sentence. Upon further questioning by the state as to why he felt the death penalty had been used unfairly, he explained that, years ago, he felt that it was racist.

In offering its reasons for striking Mr. Watson, the state informed the court that Mr. Watson had indicated on his questionnaire that he was personally, morally,

56

or religiously opposed to the death penalty and would have difficulty making an impartial decision about the defendant's guilt or innocence if the death penalty were a possible sentence; that he left several questions related to the death penalty blank on his questionnaire; that he could not give any examples of why he thought the death penalty was used unfairly; and that, several times, he stated that the death penalty is easier than a life sentence and an "easy way out."

Considering Mr. Watson's answers (and lack thereof on his questionnaire) in their entirety, his responses align with the state's assertion that he was inconsistent in his position and support the state's explanation for striking him. *See State v. Juniors*, 03-2425 at pp. 31-32, 915 So. 2d at 318 (Although "an equivocal response in answer to whether [a prospective juror] could legitimately consider voting for death . . . may not have risen to the level of a sustainable challenge for cause, it does support the race-neutral reasons furnished by the State after defense counsel objected on *Batson* grounds to the peremptory strike against [the prospective juror]."). *See also Uttecht v. Brown*, 551 U.S. 1 (2007) ("[W]hen there is ambiguity in the prospective juror's statements," the trial court is "entitled to resolve it in favor of the State."). Defendant shows no error in the court's denial of his *Batson* challenge with respect to Mr. Watson.

### C. Morgan Weir

The state used its third peremptory challenge to strike Morgan Weir, a black female. In her questionnaire, Ms. Weir indicated that the death penalty is "sad" but sometimes necessary; the best reasons to impose the death penalty are if the person has shown themselves to be a threat to others multiple times and all other actions have been exhausted; the best reasons not to impose the death penalty are if the person is remorseful and takes responsibility for the crime; the death penalty is

appropriate when a defendant "just cannot stop harming others;" and she would be "shocked, yet slightly relieved" if Louisiana abolished the death penalty. During her death qualification questioning, Ms. Weir stated that she agrees with the fact that the death penalty is an option for certain murders, including when more than one person was murdered and when the defendant is not going to stop hurting others; she is open to considering all aggravating and mitigating circumstances; and, how young the defendant is would be relevant to her in determining an appropriate penalty.

During her general voir dire questioning, when asked whether she thought it was "fair" to use an investigation technique where a detective would lie to a suspect and tell him that another suspect had told police that he was the perpetrator, in order to extract a confession, Ms. Weir responded by asking: "Can you define fair?" When told this was about her own personal opinion, Ms. Weir responded that "I guess so, yeah," to the question of whether she would consider such an inculpatory statement as evidence. Later, when defense counsel again asked about opinions on police officers lying to suspects in order to extract statements, Ms. Weir stated that "I don't know. I'm not going to say I'm okay with it." When defense counsel followed up by asking whether "it" is something she would consider in making her decision, Ms. Weir responded, "I'd consider everything, so, yes."

When instructed to offer its reasons for striking Ms. Weir, the state explained that "she expressed a great deal of concern through body language as well as her comments on the record" as to the police interrogation techniques involving misrepresentations; she asked a question about the difference between first and second degree murder; she "expressed a very serious concern about imposing the death penalty and when it might be necessary;" she felt the best reason to impose the death penalty was if the person was "a threat to others multiple times and all other

options have been exhausted"; she felt remorse and taking responsibility were reasons not to impose the death penalty; and, again, she "she would need to know this person is not going to stop hurting people" in order to impose the death penalty. The state further explained its concern that in light of the planned defense mitigation witnesses, "Ms. Weir's focus on whether or not this individual will stop hurting people would take a priority in her mind over what this man actually did."

As an initial matter, defendant is correct that the state's characterization of Ms. Weir as having a "very serious concern" about imposing the death penalty is an overstatement. Both Ms. Weir's responses on the questionnaire and during questioning indicated that she felt the death penalty was appropriate in certain circumstances. Though she never gave an exhaustive list of what she considered those circumstances to be, when asked for an example, she responded that one such circumstance would be when a person is "just not going to stop hurting other people." Similarly, on her questionnaire when asked what she felt was the *best*—but not the *only*—reason to impose the death penalty, she answered, "if the person has shown themselves to be a threat to others multiple times and all other options have been exhausted."

Thus, the state's justification for striking Ms. Weir—because "she would need to know this person is not going to stop hurting people [in order to vote for the death penalty],"—is a mischaracterization of her responses, and is unpersuasive as a genuinely race-neutral justification for striking Ms. Weir. Moreover, despite the state's apparent concern over Ms. Weir's responses, the state never questioned Ms. Weir concerning these responses, which this Court has found to be an indication of discriminatory intent. *See State v. Harris*, 01-0408, p. 8 (La. 6/21/02), 820 So. 2d 471, 476 (that potential jurors are challenged on the basis of a claimed bias, without

being questioned about such bias, raises a strong inference of exclusion on the basis of race alone); *State v. Collier*, 553 So. 2d 815, 822 n.11 (La. 1989).

Defendant also points out that although the state gave several reasons for striking Ms. Weir, there were several white jurors (Nella Barnard, Patrice Saucier, and Malcolm Jarrell), none of whom the state struck, who gave similar answers that indicated they would want to know a person's proclivity for violence and risk of recidivism in determining whether to impose a life sentence or the death penalty. The fact that the state did not strike similarly situated white jurors is not, alone, grounds to find the reason for the strike pretextual. *See State v. Juniors*, 03-2425, p. 31 (La. 6/29/05), 915 So. 2d 291, 317-18 ("[T]he fact that a prosecutor excuses one person with a particular characteristic and not another similarly situated person does not in itself show that the prosecutor's explanation was a mere pretext for discrimination. The accepted juror may have exhibited traits which the prosecutor could have reasonably believed would make him desirable as a juror.") (citing *State v. Collier*, 553 So. 2d at 822).

Here, each white juror whom defendant argues gave similar answers differed significantly enough from Ms. Weir so as to preclude any meaningful comparison and negate any inference of discriminatory intent. *See, e.g.*, *Hebert v. Rogers*, 890 F.3d 213, 223 (5th Cir. 2018) ("While a comparator-juror is not required to be identical in all regards, the comparator-juror must be similar in the relevant characteristics."). Patrice Saucier, for example, answered that the best reason for imposing the death penalty was "if there is no doubt that he/she would impose this on another victim," similar to Ms. Weir, but also indicated she thought the death penalty was used appropriately, failed to list any reasons why the death penalty should ***not*** be imposed or any circumstance when a life sentence without parole

60

would be appropriate, and indicated that she was "generally in favor of the death penalty and feel it should be imposed upon conviction of murder, with very few exceptions." Defendant exercised a peremptory challenge on Ms. Saucier.

Likewise, with respect to seated white juror Mr. Jarrell, the only time Mr. Jarrell referenced recidivism during his questioning was when the prosecutor asked him what type of things he would like to hear during the penalty phase to help him decide whether to impose a life sentence or the death penalty. In response to that question, Mr. Jarrell listed several things that would be important to him, one of which was "whether they would be a danger to other people in a correctional system, that type of thing." This statement arguably reflects a concern for the state's ability to incarcerate a defendant safely, and does not necessarily imply a concern for general recidivism. Whereas Ms. Weir referenced a defendant's propensity to continue harming others more than once in her questionnaire and during voir dire, this was Mr. Jarrell's only reference to recidivism. Nonetheless, even if Ms. Weir and Mr. Jarrell could be considered similarly situated in terms of their views on recidivism, defendant fails to point out that Mr. Jarrell differed in other ways from Ms. Weir. Notably, Mr. Jarrell agreed with the statement, "We are too lenient on criminals; people who break the law deserve harsher punishment." Additionally, when asked how he would feel if Louisiana repealed the death penalty, he remarked that he "prefer[s] the state keep the death penalty as an option."

Ms. Barnard, a seated white female juror, placed little emphasis on recidivism or reform in either her questionnaire responses or during voir dire. Ms. Barnard indicated on her questionnaire that death would be an appropriate punishment for a premediated murder or a murder of a child, though life imprisonment would be appropriate for "multiple violent offenses," and that the best reason not to impose

the death penalty is if the murder was "spur of the moment" and the defendant exhibited no prior violence. In determining whether to sentence someone to life or death, Ms. Barnard indicated she would want to know: if the crime was "heinous," whether the defendant exhibited similar prior behavior or had a pattern of using excess violence, and if the victim had a weapon or was a child. Thus, although Ms. Barnard indicated a past pattern of violence and criminal record would be something she would want to know about and consider in determining the sentence, she never referenced recidivism or the defendant's future propensity to harm others. As such, Ms. Barnard does not appear to have been similarly situated to Ms. Weir on the issues of recidivism so as to allow for a meaningful comparison.

The state's additional proffered reason for striking Ms. Weir—that she "expressed a great deal of concern through body language" and that she made comments during general voir dire concerning the use of misleading interrogation techniques—are supported by the record. Moreover, body language has been found to be a race-neutral reason defeating a *Batson* claim. *See United States v. Bentley-Smith*, 2 F.3d 1368, 1374 (5th Cir. 1993); *State v. Seals*, 95-0305, p. 8 (La. 11/25/96), 684 So. 2d 368, 374-75, *rev'd on other grounds*, 00-2738 (La. 10/25/02), 831 So. 2d 828 (noting reasons found acceptable include body language, lack of eye contact, the failure to make eye contact, juror inattention and juror "not too bright"); *State v. Aubrey*, 609 So. 2d 1183, 1187 (La. App. 3 Cir. 1992) (venire woman maintained excessive eye contact with one of defendants).[22]

---

[22] Defendant also argues that several white jurors raised similar concerns with interrogation techniques used but were not struck by the state, and asserts this disparate treatment as further evidence of discriminatory intent. Because this reason proffered by the state was coupled with the prosecutor's observation that Ms. Weir's body language evinced a level of discomfort with the police interrogation techniques, and because the credibility of such an observation is impossible to glean from a cold record, defendant's argument that white jurors who gave similar responses were kept by the state is unpersuasive.

Defendant focuses on each reason the state gave for striking Ms. Weir in a vacuum, without acknowledging that Ms. Weir exhibited several characteristics undesirable to the state, and not just one, that it found excusable in another juror. In *Miller-El v. Dretke*, the Supreme Court held that there was no need for jurors to share every characteristic in order for a comparison to be meaningful. 545 U.S. 231, 306 (2005) ("None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one."). Therefore, despite the state's mischaracterization of some of Ms. Weir's responses and its failure to question Ms. Weir with respect to her purported "serious concerns" about imposing the death penalty, her voir dire answers as a whole support the state's proffered reasons for striking her. Given the broad discretion *Batson* affords the trial judge in ruling on the fact-bound question of whether race was significant in determining who was challenged and who was not, an appellate court should not substitute its evaluation of the record for that of the trial court. *See Hernandez v. New York*, 500 U.S. at 364 ("[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal."); *Batson*, 476 U.S. at 98 n.21 ("Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference."). Defendant shows no error in the denial of his *Batson* motion with respect to Ms. Weir.

### D. Nedra Price

The state used its fourth peremptory strike to back strike Ms. Price, a black female. In her death qualification questioning, Ms. Price stated that her sister was killed when Ms. Price was very young but that she did not remember many details,

and that her sister's killer was serving a life sentence; in determining an appropriate punishment, she would want to know "if they have remorse" and if they could truly show "that they wouldn't commit a crime like that ever again;" she would consider youth in determining punishment because she does not believe in "just putting people in the prison system" and saying "that's it;" and, she believes "sometimes people, they can come back out with society and still be just like everyone else."

In offering its reasons for striking Ms. Price, the state offered that Ms. Price "wants to know the remorse, the lack of recidivism" and that youthfulness was also important to her. The state also referenced Ms. Price's comment that sometimes people could come out of prison and pose no future threat, and the state further noted that, on her questionnaire, when asked under what circumstances she thought life imprisonment without parole was appropriate, she responded "if a person is highly unlikely to commit the crime again." The state explained its concern with Ms. Price was "her focus[] on that risk of recidivism," given that defendant planned to focus on his good behavior and his capacity to be a reformed prisoner, she would be susceptible to this defense argument, and thus the state struck her for this reason.

On its face, this explanation appears both race-neutral and plausible. Defendant, however, emphasizes the state's disparate treatment of seated white jurors who gave similar answers concerning recidivism, reform, and/or remorse in their questionnaires, notably Malcolm Jarrell and Patricia Borskey.

Mr. Jarrell's responses on his questionnaire and during questioning were not as focused on recidivism as Ms. Price's answers. Mr. Jarrell, like Ms. Price, did check the box on the questionnaire agreeing with the statement that "people in prison have the opportunity to turn their life around and seek forgiveness and peace." However, the only time Mr. Jarrell referenced recidivism during his questioning was

64

when the prosecutor asked him what type of things he would like to hear during the penalty phase to help him decide whether to impose a life sentence or the death penalty. In response, Mr. Jarrell listed several things that would be important to him, one of which was "whether they would be a danger to other people in a correctional system, that type of thing." This statement, which refers only to a defendant's propensity to be contained in prison, differs from the statement Mr. Price gave, which implied she believed a defendant's youthfulness was indicative of a lower risk of recidivism and/or better chance of reform—which she in turn stated would be good reasons to impose a life sentence.

Nonetheless, even if Ms. Price and Mr. Jarrell could be considered similarly situated in terms of their views on recidivism/reform, defendant fails to point out that Mr. Jarrell differed from Ms. Price in other significant ways. Notably, Mr. Jarrell agreed with the statement, "We are too lenient on criminals; people who break the law deserve harsher punishment," and, when asked how he would feel if Louisiana repealed the death penalty, he remarked that he "prefer[s] the state keep the death penalty as an option."

Ms. Borskey is also not similarly situated to Ms. Price such that a meaningful comparison may be made. The state, in striking Ms. Price, relied primarily on Ms. Price's focus on a likelihood of recidivism. It is true that Ms. Borskey, when asked what would be important to her in determining life versus death, responded, "Some remorse for one thing." Ms. Borskey, like Ms. Price, also checked the questionnaire box next to the statement "People in prison have the opportunity to turn their life around and seek forgiveness and peace." However, unlike Ms. Price, Ms. Borskey otherwise never touched on reform or recidivism in her questionnaire or during her voir dire answers.

Defendant has failed to show that any similarly situated white juror was treated differently than Ms. Price. Thus, because the state's reason for removing her was race-neutral and plausible, he shows no error in the trial court's denial of his *Batson* motion as to Ms. Price.

### E. Denise Malancon

The state used its fifth peremptory challenge to back strike Denise Malancon, a black female. On her questionnaire, Ms. Malancon indicated: her brother was the victim of a (still unresolved) homicide in 2008; she felt the appropriate punishment for murder was life without parole; the death penalty, while it might give some consolation to the victim's family, does not bring back a loved one; the best reason to impose the death penalty is when someone intentionally causes harm to others in a violent way; the best reason not to impose the death penalty is one caused harm to others without premeditation; the death penalty is too costly to taxpayers due to the appeal process; the death penalty is appropriate when the defendant committed cold-blooded acts without remorse; and, a life sentence without the possibility of parole is an appropriate sentence when the defendant shows remorse. Ms. Malancon also checked the space next to the sentiment: "I am philosophically opposed to the death penalty, but would be able to vote guilty if the state proved the defendant guilty of murder beyond a reasonable doubt." Ms. Malancon also indicated she agreed with the following statements: "Our penalties and sentences are too harsh; we need to focus on rehabilitation;" "we should look at all the circumstances surrounding the crime and the person to determine the appropriate punishment;" "people in prison have the opportunity to turn their life around and seek forgiveness and peace;" and, "innocent people have been convicted and sentenced to die."

During death qualification questioning, Ms. Malancon initially responded that she would not automatically consider the death penalty or a life sentence over the other and would make that determination based on all the information she has. Upon being questioned by the state about how she felt about serving on a death penalty case, she responded that she was not exactly sure, that it would depend on the evidence presented, and that she would not rush to judgment. When asked what would be important to consider before deciding between the death penalty and a life sentence, she responded that she was not sure, but that "I guess depending on the type of crime that was committed, if there was . . . some additional history of other type of crimes and maybe the nature of the crimes, the character of the person, you know, prior to or the individual . . . that they were, things like that, and I guess if they . . . had, you know, showed some remorse for what had occurred[.]" When asked about her response on her questionnaire concerning the cost to taxpayers of the death penalty, Ms. Malancon responded that she had seen something recently in the news that indicated it sometimes takes up to 20 years for appeals to be completed, but that this would not be a reason for her not to impose the death penalty. When specifically asked if she agreed with the death penalty, Ms. Malancon responded, "In some instances, I think it's applicable. I can't say which." Ms. Malancon also explained that although she does have some religious and/or philosophical opposition to the death penalty, she could "follow the evidence and make whatever decision based on the evidence[.]"

Upon questioning from defense counsel, Ms. Malancon discussed her brother's murder, and explained that she would not hold that against defendant nor allow it to cloud her judgment in this case. She also explained that the cost of housing

67

an inmate would not factor into her decision concerning the penalty, and that she could be fair and impartial.

In explaining its reasons for striking Ms. Malancon, the state pointed to her questionnaire response in which she indicated she was philosophically opposed to the death penalty. The state further noted that "she on several occasions indicated that the death penalty does not bring the victims back" and "expressed a serious concern and focus about the cost of the death penalty, and that it was used too often." The state also noted that on question number 85 of the survey, which asks, in determining whether to sentence someone to life or death imprisonment, what would you want to know about: a) the crime; b) the person convicted; c) the victim; and d) anything else, Ms. Malancon wrote "N/A" next to a)–d). The state asserted that this would indicate that "she under no circumstances would consider the death penalty." The state pointed also to her responses that the death penalty may give the family consolation but that it does not bring back lost loved ones, that punishments were too harsh, and that the focus should be on rehabilitation. Lastly, the state offered: "She also expressed a focus upon remorse when being questioned as a reason that she thought would be important not to impose the death penalty. And the state does not want individuals on the jury who would make the remorse their primary focus. It causes us concern."

Defendant correctly points out that, although the state argued that Ms. Malancon "stated on several occasions that the death penalty does not bring the victims back," this was not the case. Ms. Malancon did write that on her questionnaire, but did not reference this during her testimony. Defendant also correctly notes that, although Ms. Malancon did indicate a concern for the cost of the death penalty, she explained that this was due to a recent news article she read,

and indicated that the cost would not be a reason for her not to vote for the death penalty. Defendant also points out that, although the state appeared primarily concerned with Ms. Malancon's potential focus on remorse, the state's strategy of showing that he was not, in fact, remorseful, would tend to negate this concern.

The state, however, was correct to note that Ms. Malancon did indicate on her questionnaire that she felt the system should focus more on rehabilitation, which, as noted in discussion of other potential jurors in this section, was problematic for the state because it knew the defense planned to present evidence of defendant's good behavior in prison and potential for reform. Moreover, the state pointed out Ms. Malancon's questionnaire response in which she expressed that she was philosophically opposed to the death penalty.

The totality of Ms. Malancon's answers indicates inconsistency in her attitude concerning the death penalty, and some uneasiness with its use and application. Thus, the state's decision to peremptorily strike her does not appear founded on race. *See State v. Juniors*, 03-2425 at pp. 31-32, 915 So.2d at 318 (Although "an equivocal response in answer to whether [a prospective juror] could legitimately consider voting for death ... may not have risen to the level of a sustainable challenge for cause, it does support the race-neutral reasons furnished by the State after defense counsel objected on Batson grounds to the peremptory strike against [the prospective juror]."); *see also Uttecht v. Brown*, 551 U.S. 1, 7 (2007) ("[W]hen there is ambiguity in the prospective juror's statements," the trial court is "entitled to resolve it in favor of the State."). Defendant shows no abuse of discretion in the court's denial of his *Batson* challenge with respect to Ms. Malancon.

69

### F. Savannah Jule

The state used its sixth peremptory strike to back strike Savannah Jule, a Hispanic female. Defendant concedes that Ms. Jule does not fit into the state's alleged pattern of striking black jurors, but argues that the state's exclusion of her is relevant to the question of intentional racial discrimination.

In stating its reasons for striking Ms. Jule, the state explained that Ms. Jule expressed concern about the interrogation techniques police may use, and indicated that she was very concerned about potential false confessions. The state also noted that Ms. Jule was "extremely" young (age 25). Lastly, the state noted that Ms. Jule indicated she would need to find the defendant "absolutely guilty" before even considering the death penalty.

The record supports the state's assertion that Ms. Jule expressed concerns about false confessions in the face of investigative techniques used in this case. During general voir dire, she explained her opinion that "[s]ometimes people just get tired of being questioned or they feel like they are under a lot of pressure, and it's just like I'm going [to] say whatever I have to say to get you to leave me alone," and further stated that "if you feel like there's somebody saying you were at this crime scene when you weren't there, I think there is a chance that that person is going to admit to something that they didn't do[.]" Considering that the state's case at the guilt phase relied heavily on defendant's confession, obtained after 11 hours of police custody and some misrepresentations made by the interviewing detectives, Ms. Jule's concerns about those very circumstances producing false confessions was a legitimate and race-neutral reason to strike her from the jury.

Defendant, however, argues that seated white jurors Patricia Borskey, Suzanne Carter and Kristen Procell, and Mary Johnson (on whom defendant

70

ultimately exercised a peremptory challenge), expressed similar concerns and yet were not struck by the state. Hence, he argues this proffered reason was merely a pretext for race.

The record establishes that these other jurors, however, did not give responses concerning interrogation techniques that were as lengthy or as specific as those Ms. Jule gave. Ms. Jule specifically stated that she felt that under the types of police interrogation techniques used in this case (*i.e.*, misrepresentations), she could foresee a suspect giving a false confession. Ms. Carter, however, only remarked that she felt that she would be "delirious" after being questioned for 12 to 14 hours straight, circumstances that did not exist in Turner's police interrogation. Ms. Procell remarked that she could see how certain techniques could "kind of wear [a suspect] down" and "possibly . . . force them to say [things]" but was not as detailed or as unequivocal in her remarks as Ms. Jule. Ms. Johnson simply stated that she felt the "exact same" as Ms. Procell, without elaboration.

Ms. Borskey appears to have shared Ms. Jule's concerns regarding interrogation techniques, albeit her response was not as lengthy. Ms. Borskey stated that she "does not like the fact that police are allowed to lie to make someone come up to the truth just because they get tired of someone badgering them, and perhaps they coerced a confession that really isn't true." Even if this alone could be considered similar, Ms. Borksey displayed several characteristics that Ms. Jule did not, which undercuts any comparison based solely on the two jurors' similar feelings about interrogation techniques. Ms. Borksey, unlike Ms. Jule, indicated she could "not think of any" reasons *not* to impose the death penalty on her questionnaire and she indicated she was "generally in favor of the death penalty and feels it should be imposed upon conviction of murder, with very few exceptions."

71

Under these circumstances, defendant shows no abuse of discretion in the court's denial of his *Batson* challenge with respect to Ms. Jule.

### G. Lanell Craig

The state used its seventh peremptory challenge to back strike Lanell Craig, a black female. At the time it made the challenge, the state had used six of its seven strikes to remove black jurors, with the other strike being used to remove a Hispanic juror, Ms. Jule. Defense counsel noted that although the court had denied its earlier *Batson* challenges as to the state's first six challenges, "this continues to still be a pattern." The court responded:

> Well, I didn't find there was a pattern [before]. I made [the state] give her reasons and found [the state's] reasons were race neutral and gender neutral. And do you have something else other than [that the state] used a peremptory on another one?"

Defense counsel responded in the negative: "No, your Honor," to which the court responded, "All right," before the court moved on to consider the next available jurors, implicitly finding that defendant had again failed to make a prima facie showing under the first step of *Batson*.

The state's use of six of seven strikes exercised against black jurors, or roughly 85% of its challenges, could support a conclusion that the trial judge did abuse his discretion in finding that the defense had failed to pass *Batson*'s first step. *Cf. Johnson v. California*, 545 U.S. 162, 170 (2005) (because *Batson* did not mean to impose an onerous burden as the first step in its analysis, a defendant need produce only "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.").

This Court has held, however, that bare statistics alone are insufficient to show a prima facie case of discrimination. *State v. Duncan*, 99-2615, p. 22 (La. 10/16/01),

802 So. 2d 533, 550 (citing *United States v. Moore*, 895 F.2d 484, 485 (8th Cir. 1990)). In *Duncan*, the defendant argued that racial discrimination could be inferred from the record, which showed the state had struck 84% of prospective black jurors and only 12% of prospective white jurors, using five of its eight peremptory challenges to strike black jurors. This Court held, "there is not a per se rule that a certain number or percentage of the challenged jurors must be black in order for the court to conclude a prima facie case has been made out." 99-2615 at 22, 802 So. 2d at 549-50. However, the Court explained that "such number games, stemming from the reference in *Batson* to a 'pattern' of strikes, are inconsistent with the inherently fact-intense nature of determining whether the prima facie requirement has been satisfied." 99-2615 at 22, 802 So. 2d at 550. This Court further explained that it is important for a defendant to come forward with facts, not numbers alone, when asking the trial judge to find a prima facie case. *Id*. (citing *Moore*, 895 F.2d at 485). Consequently, in *Duncan* this Court held the defendant's reliance on bare statistics to support a prima facie case of race discrimination was misplaced.

Here, despite statistical support for an inference of discrimination, when the court ruled on this particular *Batson* challenge, it had just found that the state's use of its prior six challenges to remove five black and one Hispanic juror did not involve purposeful discrimination. Thus, it was not against a blank slate that defendant made the objection with respect to Ms. Craig; rather, the court had already determined that defendant had failed to show that the state engaged in any purposeful discrimination in its first six challenges, and thus the state's seventh challenge, albeit made against another black juror, was to some extent set apart from the first six. In effect, by arguing to the court that using six out of seven challenges against black jurors revealed a pattern of discrimination, defendant was attempting to piggy-back this

73

seventh objection onto his earlier (failed) objections concerning state's first six challenges, which had already been deemed non-discriminatory. Having found no purposeful discrimination concerning the state's first six strikes, it is difficult to see how defendant can show, without more, that the seventh strike continued a discriminatory pattern which the trial court justifiably found not to exist. Because defendant has failed to offer any other evidence from which to infer discriminatory intent, the trial court did not abuse its discretion in finding that defendant had not made a prima facie case with respect to Lanell Craig.

### H. Michael Smith

Mr. Smith, a black male, indicated in his jury questionnaire that: he had an overall good impression of law enforcement; the best reason to impose the death penalty is to keep the streets safe; the best reason not to impose the death penalty is to reform a person; and he was generally in favor of the death penalty. During death qualification, Mr. Smith stated that he had been the victim of an armed robbery committed by an acquaintance, but that he did not think that would influence him in this trial and he was not that traumatized by it; he could consider all mitigating evidence; he would probably vote for the death penalty in a double-homicide committed during an armed robbery, but would be open to a life sentence; and, in determining punishment he would consider whether the defendant was "beyond redemption," and whether the defendant was remorseful. No challenges were made afterwards. The state later used its eleventh peremptory challenge to back strike Mr. Smith and, after defendant raised a *Batson* objection, the trial court noted that "once again, it's one more. We have gone through all the other strikes, and I did not find a pattern. I don't find one now, but I will have [the state] provide her race-neutral reasons for striking Mr. Smith."

74

The state responded that it "boil[ed] down to one thing" from Mr. Smith's questionnaire that the state "just cannot let go of," and that was his response to "what is the best reason not to impose the death penalty?" Mr. Smith's response was "to reform a person." The state further noted that it knew the defense would be calling witnesses to talk about how defendant had not caused any problems in prison, and the prosecutor noted that she "just can't let go of that." Defense counsel responded, recounting Mr. Smith's remarks that he would probably vote for the death penalty unless defendant showed remorse or redemption. The state responded again, explaining that the remorse and redemption angle was precisely why they were using the strike on Mr. Smith. The court responded: "I find they are race neutral reasons why the state would strike Mr. Smith. That *Batson* motion is denied."

The state's concern that Mr. Smith would focus on defendant's ability to be reformed by a life sentence as opposed to the death penalty was a race-neutral reason to strike Mr. Smith. The state was aware that the defense planned to present evidence of defendant's good behavior in prison as well as the argument that, if his life was spared, he had a chance at reformation and/or redemption.

Defendant argues the state's proffered reason was a pretext for race. First, defendant correctly notes that, despite its apparent inability to "let go of" Mr. Smith's questionnaire response concerning the best reason not to impose the death penalty, the state never questioned Mr. Smith regarding that response at all. Such a lack of questioning undercuts the persuasiveness of an otherwise race-neutral reason. *See Harris*, 01–0408, p. 8, 820 So.2d at 476; *Collier*, 553 So. 2d at 822 n.11.

Defendant also points out that several seated white jurors—Ms. Barnard, Ms. Phelps, Mr. Jarrell, Ms. Procell, and Ms. Borskey, along with several other white jurors who were peremptorily struck by the defense—gave similar responses

75

concerning reform/redemption, and the state did not strike those jurors. This, defendant argues, is further evidence that the proffered reason was pretext for race. Defendant argues these jurors had similar concerns because they all checked a box on their questionnaires indicating they felt "people in prison have the opportunity to turn their life around and seek forgiveness and peace." This response on the questionnaire, however, differs from Mr. Smith's response. Agreeing with a generalization that a person may have the opportunity to be reformed in prison is not the equivalent of believing that potential for reform is the ***best*** reason not to impose the death penalty—particularly when, as in this case, the state knew that the defense would rely on evidence meant to suggest defendant's promising chances at reform in arguing for a life sentence during the penalty phase.

Defendant further argues that prospective jurors Mary Johnson and Tammy Salter (both of whom were peremptorily struck by the defense) checked the box on their questionnaires indicating they agreed with the statement "our penalties and sentences are too harsh; we need to focus on rehabilitation." Despite these responses, however, neither responded in a similar manner to Mr. Smith to the question asking the ***best*** reason not to impose the death penalty. Ms. Salter responded that the best reason not to impose the death penalty was "accidental homicide," and Ms. Johnson responded that the best reason was "mental incapacity."

Defendant next argues that prospective jurors Peggy Twyman and Patrice Saucier (both peremptorily struck by the defense) had similar views regarding the potential for reform, but were not struck by the state. Defendant notes that Ms. Twyman wrote that the best reason not to impose the death penalty was "[an] isolated incident," and Ms. Saucier responded that the best reason to impose the death penalty

76

was "[i]f there is no doubt that he/she would impose this on another victim."[23] Again, these two responses are not similar to Mr. Smith's response that the best reason to impose a life sentence is "to reform a person." Ms. Twyman's and Ms. Saucier's responses seem focused on a lack of criminal history and recidivism, respectively, not the potential for reform. Given the above, defendant fails to show that any white jurors similarly situated to Mr. Smith were accepted by the state.

Defendant also argues that pretext is shown by the state's proffer of a "second implausible reason" offered after defense counsel had responded to the state's initial proffered race-neutral reason. The state's second reason was Mr. Smith's purported focus on remorse and/or redemption. A review of the transcript, however, indicates the state was not proffering an actual second reason for striking Mr. Smith, but was pointing out that Mr. Smith's answers during questioning concerning remorse and/or redemption were in line with his questionnaire response concerning reform on which the state initially based its strike. The state prefaced this "second" proffered reason by stating "And that goes back to the problem, the remorse and redemption. The same reason we challenged people who work in the prisons." Rather than proffering a true second reason, the state was reasserting that Mr. Smith's statements during questioning were further proof of his views on reform and remorse, which were the stated reason for the strike. This situation does not rise to the level of that in *Miller-El*, where the state's second, unrelated reason for striking a juror "reek[ed] of afterthought." *Miller-El*, 545 U.S. at 246.

Further complicating a *Batson* analysis here, in its responses, the state appears to lump together reform, redemption, and remorse. While they are related concepts,

---

[23] Defendant fails to mention that Ms. Saucier also wrote that the best reason ***not*** to impose the death penalty was "N/A".

they have different meanings, particularly when considering the facts of this case. The defense sought to show defendant's potential for reform and rehabilitation in prison; the state sought to highlight his lack of remorse. Thus, as defendant points out, a juror to whom remorse was important was a good juror for the state, and a juror who tended to think people could be reformed and/or redeemed in prison was not ideal for the state. Accordingly, to the extent the state was attempting to assert that it struck Mr. Smith due to responses indicating he would consider a life sentence if a defendant showed remorse, this was a much less plausible reason than if the state had struck Mr. Smith because he seemed focused on the potential of reform and redemption that a life sentence would bring. Considering, however, that the state clearly led its proffered race-neutral reason by pointing to the "reform" response from Mr. Smith's questionnaire, it seems more likely the issue of reform was the state's true concern, and its later reference to "remorse and redemption" was directed more at the reform concept than remorse.

Given the trial judge's broad discretion in ruling on *Batson* claims, and given the fact that the state's arguable "second" proffered reason did not come under circumstances like those in *Miller-El*, relied on by the defense, defendant fails to shows any error in the trial court's denial of his *Batson* motion as to Mr. Smith.[24]

---

[24] Separate from the reform/remorse argument, defendant argues in his briefs that four seated white jurors (Nella Barnard, Winter Phelps, Suzanne Carter, and Malcolm Jarrell) expressed more hesitation about the death penalty than Mr. Smith, proving that the state's given reason for the challenge was a pretext. Defendant's argument on this point is not persuasive. As with earlier comparisons defendant attempts to make in the *Batson* context, each white juror whom defendant points to differs significantly enough from Mr. Smith in other ways so as to preclude any meaningful comparison and negate any inference of discriminatory intent.

Defendant also argues that three seated white jurors expressed difficulty with interrogation techniques that the State found objectionable when expressed by several of the black jurors it struck. According to defendant, Mr. Smith had "no problem with any of the interrogation techniques discussed." However, as noted above, the fact that the state did not strike similarly situated white jurors is not, alone, grounds to find the reason for the strike pretextual, because the

## I. Sequence of State's Strikes

Defendant also argues that the sequence of the state's peremptory strikes and is "indicative" of discriminatory intent. He argues that the state used six out of seven of its first strikes on black jurors, and that it was only after the defense had raised two *Batson* objections that the state struck two white jurors. Defendant further alleges that, then, "having somewhat corrected the racial disparity [in] its strikes," the state used its eleventh peremptory strike to back strike the only remaining black male, Michael Smith, on the venire.[25] Further, defendant argues, only when it was down to its last strike did the state finally accept a black juror, Ashley Andrews, and was forced to accept Belinda Guillard after it had used all of its peremptory strikes. Defendant argues this sequence of strikes is indicative of discriminatory intent, citing *State v. Givens*, 99-3518 (La. 01/17/01), 776 So. 2d 443, 450-51, and *Miller-El v. Dretke*, 545 U.S. 231, 249-50 (2005).

In *Givens*, the trial court denied defense objections to the state's use of six strikes to remove male jurors for no apparent reason, three of which were back strikes after it had already accepted the jurors, resulting in a final jury composition of 11 women and one man. The trial court did not require the state to provide reasoning, leaving this Court no choice but to presume the trial court had found no prima facie showing of discriminatory intent. Based on the number and sequence of strikes, and the resulting disparate impact on the final jury composition, this Court found that the trial court should have required the prosecutor to offer gender-neutral

---

seated juror "may have exhibited traits which the prosecutor could have reasonably believed would make him desirable as a juror." *Juniors*, 03-2425, p. 31, 915 So. 2d at 317-18.

[25] Defendant's brief states that Mr. Smith was the tenth peremptory challenge, but a review of the record indicates he was the eleventh. In any event, whether he was tenth or eleventh is not germane to this decision.

reasons for the strikes and remanded for this purpose. *Givens*, pp. 6-8, 776 So. 2d at 449-51.

In the instant case, the state's use of six of its first seven peremptory challenges on black jurors was, as discussed above, likely enough evidence to show a prima facie case of discrimination, much like this Court found in *Givens*. Although the trial court therefore erred in finding otherwise, unlike in *Givens,* the court here allowed the analysis to proceed to step two of the *Batson* framework by ordering the state to give race-neutral reasons for the strikes, which it did for each of the jurors, including Mr. Smith (with the exception of Lannell Craig, as discussed above). Having determined that the state's race-neutral reasons were plausible and supported by the record, the sequence of strikes here does not carry the same significance as those in *Givens*.

## J. Disparate Questioning

Turning to the issue of disparate questioning, defendant argues that, as in *Miller-El v. Dretke*, the state used disparate questioning of black and white jurors designed to elicit plausibly neutral grounds for a peremptory strike directed to black jurors versus white jurors.

In *Miller-El*, the defendant presented significant evidence that the prosecutor's race-neutral explanations were pretextual, including, *inter alia*: (i) the state peremptorily struck 10 of 11 eligible black jurors, *i.e.*, 91% of the eligible black venire panelists, a disparity "unlikely" to have been caused by "[h]appenstance" (545 U.S. at 233); (ii) the state asked 53% of black panelists but only 3% of non-black panelists questions with a "graphic script meant to induce qualms about applying the death penalty (and thus explain a strike)" (*id.* at 256); (iii) the state subjected 100% of black panelists but only 27% of non-black panelists to "trick

80

questions" about minimum accepted penalties for murder, "meant to induce a disqualifying answer (*id.* at 262); and (iv) the district attorney's office had a "specific policy of systematically excluding blacks from juries," a method known as "jury shuffling" (*id.* at 263-64). The Supreme Court noted that some of the prosecutor's proffered explanations for striking black panelists from the jury pool were "equally on point" to white jurors whom the prosecutor declined to peremptorily strike, and found that, in explaining reasons for his strikes, the prosecutor mischaracterized certain testimony the jurors gave during voir dire. When this was pointed out, the prosecutor offered another reason for the strike rather than respond to or defend his initial explanation. The Supreme Court found that "[i]t would be difficult to credit the State's new explanation, which reeks of afterthought," supporting the defendant's contention that the prosecutor's neutral explanations were pretextual. *Miller-El*, 545 U.S. at 240-46. *Compare State v. Allen*, 03-2418, pp. 18-19 (La. 6/29/05), 913 So. 2d 788, 802-03 (explaining *Miller-El* factors and distinguishing those from a case in which the state used 50% of its strikes on black jurors). The Supreme Court therefore held that the prosecutor employed disparate questioning to produce challenges for cause as to black jurors, and, when coupled with the other factors identified above, were corroboration of race-based strikes of jurors.

Here, defendant asserts that, as in *Miller-El*, the state "tended to" question black jurors more aggressively about their views on the death penalty, displaying "significantly" more skepticism about their ability to vote for the death penalty, and distrust of their assurances that they could. In contrast, the defendant argues, the state "tended to" be more accepting of white jurors' ability to consider death, even questioning many blatant pro-life jurors in ways designed to produce "correct" answers. Defendant gives examples of the allegedly disparate questioning, pointing

81

to exchanges in the record that he claims support his argument. Defendant analyzes the questions presented to white jurors versus black jurors who had relatives who were victims of violence, and the language used to explain the law to white jurors versus black jurors.

The circumstances here do not rise to the level present in *Miller-El*. There, the questioning was reduced to objective, quantifiable aspects, which broke heavily and significantly along racial lines (*i.e.*, 100% of black panelists asked certain questions versus 27% of non-black panelists). Here, defendant uses language such as "tended to" or "more likely to" to describe the state's disparate questioning, but neither quantifies that language in a usable way, nor defines how certain language was coded as falling into one category or another. *See Allen*, 03-2418, p.18, 913 So. 2d at 802 (noting that the defendant did not demonstrate a "discernable pattern of discriminatory intent"). As such, defendant does not show that the entire voir dire environment in this case demonstrated discriminatory intent on the part of the state.

Defendant does offer quantitative proof of disparate questioning with respect to one issue. Defendant argues that of the 32 potential jurors who noted on their questionnaires that they or someone they knew had been the victim of a homicide or armed robbery, 19 were white, 12 were black, and one was Hispanic. The state chose to question 13 of those potential jurors concerning those responses, and of those 13, eight were black and five were white. Thus, defendant argues, the state was more than twice as likely to ask black potential jurors about this questionnaire response, asking 66.7% of the black panelists, but only 26.32% of the white panelists.

Even when considering defendant's comparative analysis on this issue, the analysis is not as persuasive as in *Miller-El*, in which both analyses produced a much more statistically significant gap in treatment based on race. Moreover, the other

82

factors present in *Miller-El*—such as jury shuffling, the state's failure to strike similarly situated white jurors who gave responses similar to those used to justify a peremptory strike of a non-white juror, and a history of systemic discrimination of black people from jury panels by the district attorney's office during the time of defendant's trial—are not present here. As such, defendant fails to show error in the trial court's denial of his *Batson* challenges on these grounds.

### Assignments of Error Nos. 8, 9

Defendant argues that a prospective juror's improper comments tainted the first panel of the jury venire, depriving defendant of his right to an impartial jury. Defendant specifically argues that prospective juror Ron Sumer, a member of the first death qualification panel, tainted that first panel by improperly speaking to other prospective jurors about the victims and facts of this case. Because Nella Barnard, who ultimately served on defendant's jury, was on the same panel, Turner argues his rights to an impartial jury and to a fair and reliable capital sentencing hearing were violated. As such, he argues that his motion for new trial should have been granted, and urges this Court to reverse his convictions and remand for an evidentiary hearing to determine the scope of the prejudicial comments and their impact. Under La. C.Cr.P. art. 851(4), a court "shall grant a new trial whenever . . . defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, not withstanding the exercise of due diligence by the defendant, was nor discovered before the verdict." A ruling on a motion for a new trial rests within the sound discretion of the trial judge. *State v. Quimby*, 419 So.2d 951, 960 (La. 1982).

Mr. Sumer was the eighth juror individually questioned from the first death qualification panel, and testified that he knew both victims in this case. Both the

state and defense urged the court to excuse Mr. Sumer from service on this basis, but asked that the court question him further as to whether he had discussed the case with anyone else in the jury room. The court agreed to question him further, and Mr. Sumer informed the court that when they were "in the first room before you spoke," the other jurors asked him something, and he told them "which case it was. That's it. I didn't know." The court asked if he went into any depth other than to say it was the Carquest case, and Mr. Sumer responded that he did not, and further confirmed that he did not discuss either of the victims or any specifics about the case. The court excused Mr. Sumer from service.

After trial, defense counsel interviewed jurors in Mr. Sumer's panel in an attempt to determine whether he had spoken about the case with potential jurors. Anthony Isaac, a potential juror in the same death qualification panel as Mr. Sumer, stated that Mr. Sumer did give details about the case. Mr. Isaac stated in a sworn statement that when all the jurors were in a room together, Mr. Sumer began explaining the case to them:

> I was called for jury duty for Lee Turner's trial. When I showed up to report for duty, we were all sitting in a room together. One of the men in there told us that he was best friends with the victims. He knew them and hung out with them often. He told us what Lee Turner did. He said that Lee Turner killed them and told us what a brutal crime scene it was. He knew that Lee Turner did it. We talked about it for about 15 minutes. Because he was friends with the victims, he knew he would not be on the jury.

Defendant argues these comments "could have influenced at least one juror's vote."

The only juror from Mr. Sumer's panel to be seated was Nella Barnard. Ms. Barnard was the first juror to be individually questioned. Defense counsel specifically asked her if she had heard anything about the case or had any preconceived ideas about it, to which she responded, "I live out [in Central] and I

84

don't—I'm not good about paying attention to crime in Baton Rouge. I'm sorry." She later reiterated, "I don't know anything about the case[.]" Likewise, during her general voir dire questioning, Ms. Barnard never alerted the court of any newly-gained information concerning the case.

Mr. Isaac testified during his death qualification individual questioning that although he knew a little bit about the case ("[I]t happened at Car Quest and I think what I remember was the guy went into the back of the building or something"), he had seen this information on the news—not from another juror. Mr. Isaac was excused for cause due to his anti-death penalty views.

"In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending is deemed presumptively prejudicial." *State v. Scott*, 04-1312, p.71-72 (La. 1/19/06), 921 So. 2d 904, 952 (internal ellipses omitted) (overruled on other grounds) (citing *Remmer v. United States*, 347 U.S. 227 (1954)). If a defendant is able to demonstrate, by preponderance of credible evidence, through juror testimony, that the juror was exposed to extrinsic evidence, a presumption of prejudice becomes operative that can be overcome by showing that the error was harmless. *Id.*

Defendant fails to show that any juror was exposed to any extrinsic evidence. The only evidence he produced was the statement from Mr. Isaac, which was contradicted by Mr. Isaac's own sworn testimony. Moreover, Mr. Sumer's testimony as well as that of Ms. Barnard and the other jurors of the first death qualification panel indicate that no such prejudicial or case-specific remarks were made in the jury room. Defendant failed to meet his burden of showing an extraneous influence was present in the jury room, and thus shows no error in the court's denial of his motion for new trial on this grounds.

85

*Assignment of Error No. 10*

Defendant argues that the court erred in granting the state's challenge for cause as to potential juror Donovan Brunious, who indicated that she "wouldn't want to look at [the autopsy photographs]. . . . I probably would have a problem with it. I just don't think that I could." The state challenged Ms. Brunious for cause, and after hearing brief argument, the court determined that "the problem is she's saying she's not going to look at some of the evidence. . . . I am going to grant the challenge for cause. She was clear about it. She doesn't think she can look at it. That is part of the state's case. It's hard to accept a juror that's going to ignore part of the evidence."

The state is entitled to harness "the moral force of the evidence" to make its case. *State v. Letulier*, 97-1360, pp. 17-19 (La. 7/8/98), 750 So. 2d 784, 794-95 (even gruesome photographs are admissible unless they are "so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient evidence, *i.e.,* when the prejudicial effect of the photographs substantially outweighs their probative value"). Ms. Brunious's response that she did not think she could look at the autopsy photographs was tantamount to a declaration that she would not consider certain evidence, and as such, was subject to challenge for cause. Defendant shows no abuse of discretion in this ruling.

*Assignment of Error Nos. 11, 12*

Defendant filed a motion to quash the petit jury venire on April 17, 2015 (four days after voir dire began), alleging systemic and intentional underrepresentation of black panelists. He specifically alleges that although black people represent 46.1% of the adult population in East Baton Rouge Parish, of the 182 jurors selected for the venire, only 63 were black, comprising just 34.6% of the venire, and representing an absolute disparity of 11.5%, and a comparative disparity of 24.9%. The trial court

held a hearing where defendant presented testimony and evidence, but the court ultimately denied the motion as untimely, noting that even if the motion was timely, it was without merit.

As an initial matter, we find that the motion was untimely. Motions to quash a general or petit jury venire on the basis that the venire was improperly drawn, selected, or constituted must be filed within three days before trial or, with the court's permission, before the commencement of trial. *See* La. C.Cr.P. art. 532(9); art. 535, cmt. c(2) ("This objection is waived unless it is urged before trial by a motion to quash the venire. . . .").

As to the merits, La. C.Cr.P. art. 532(9) provides that a motion to quash may be based on the ground that "[t]he general venire or the petit jury venire was improperly drawn, selected, or constituted." Additionally, under La. C.Cr.P. art. 419(A), a petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race. The burden of proof "rests on defendant to establish purposeful discrimination in the selection of grand and petit jury venires." *State v. Lee*, 559 So. 2d 1310, 1313 (La. 1990). As the Supreme Court has explained:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that his under-representation is due to systematic exclusion of the group in the jury selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Though defendant argues that disparity in the voter registration lists in comparison to the venire panel establishes purposeful discrimination, under *State v.*

87

*Ashworth*, 97-2917, p. 1 (La. 11/25/97), 704 So. 2d 228, 229, this alone is insufficient to establish a Sixth Amendment violation. Defendant must point to a "showing in the record of [a] discrimination against a class of people" in order to establish a cross-section violation occurred in his case. *Id.*

Defendant has not established entitlement to relief on this basis. Nothing in the record or in defendant's application suggests the underrepresentation of black panelists generally, and black men specifically, was due to a systematic exclusion of the group. *Duren*, 439 U.S. at 364. Mona Collins, director of jury management at the 19th Judicial District Court, testified that the court uses an automated software program that performs a "random pull" of the names from the voter registration logs and DMV records to send out 325 summonses in each case that requires a jury. Because defendant fails to show "systematic exclusion," he is not entitled to relief.[26]

### Assignments of Error Nos. 13, 14

Defendant argues La.C.Cr.P. art. 798(2), which allows for disqualification of a juror based on conscientious scruples against the infliction of capital punishment, has a racially discriminatory impact. As such, he argues, excluding jurors for cause under La. C.Cr.P. art. 798(2) violated the fair cross section requirement and the equal protection clause. Here, he argues, its use in removing 38.18% of the black jurors during the death qualification stage of voir dire (as opposed to 13.46% of the Caucasians) is an unconstitutional violation of the equal protection clause and the

---

[26] Defendant also argues that the use of automated software is problematic because it relies on voter registration rolls. Defendant asserts that in *Scott v. Schedler*, No. 11-926, 2013 WL 264603 (E.D. La 1/23/13), the court issued a ruling in which it found that Louisiana had violated Section 7 of the National Voting Rights Act ("NVRA"). Defendant fails to note that the ruling on which he relies also states that the state agency defendants were in violation of NVRA mandates **prior to April 2011**, but that, since that time, "have made substantial progress in complying with the NVRA." *Id.*, at *15. Defendant fails to show how this ruling concerning the NVRA is reflective of any systemic exclusion affecting his venire drawn in 2015.

Sixth Amendment's right to a fair cross section. He filed a pre-trial motion to quash and a motion for a new trial on the same grounds, both of which the trial court denied.

In *State v. Odenbaugh*, 10-0268 (La. 12/6/11), 82 So. 3d 215, this Court addressed defendant's argument that Louisiana's death qualification process is unconstitutional because it violates the right to an impartial jury, unfairly leads to a death-prone jury, and denies a fair cross-section of the venire available to non-capital defendants. The Court explained:

> [T]here should be no question of the constitutional validity of La. C.Cr.P. art. 798 since it was drafted to conform to the constitutional requirements set forth in [*Witherspoon*]; see also [*Witt*]. In *Lockhart v. McCree*, 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986), the Supreme Court held that the Constitution does not prohibit excluding potential jurors under *Witherspoon* or that "death qualification" resulted in a more conviction-prone jury. Likewise, this Court has repeatedly rejected the claim that the *Witherspoon* qualification process results in a death-prone jury. . . . This Court finds no need to revisit this longstanding principle of law.

10-0268, p. 48, 82 So. 3d at 248-49 (internal citations omitted). Likewise, defendant here does not explain why the reasoning in *Odenbaugh* does not apply to his case nor why this Court's jurisprudence should be disturbed. Therefore, these assignments of error fail.

### Assignments of Error Nos. 15, 16

Defendant argues the trial court erred in granting the state's challenge for cause of 23 jurors based on La. C.Cr.P. art. 798(2) after they expressed opposition to capital punishment based on religious beliefs.[27] He argues the state's challenges violated the First Amendment and the Louisiana Religious Freedom Act, R.S. 13:5230 *et seq*. He further claims that the exclusion of citizens from jury service

---

[27] Before trial, defendant filed a motion to quash as unconstitutional La.C.Cr.P. art. 798(2) due to its alleged discrimination based on religion, and raised the issue again in his motion for new trial with a request for an evidentiary hearing. The court denied both motions.

under La. C.Cr.P. art. 798 because of their religious beliefs improperly burdens the free exercise of religion, and that death qualification is unconstitutional, because it does not serve any compelling government interest that cannot be served by means less burdensome on citizens' free exercise of religion. As such, defendant argues his convictions and death sentences should be reversed to vindicate the rights of these individuals, and because no confidence can be had in a verdict imposed by a jury from which numerous citizens were unlawfully excluded. After hearing argument, the trial court denied defendant's pretrial motion and, later, his motion for new trial, based on this argument.

As noted above, La. C.Cr.P. art. 798 was drafted to conform to *Witherspoon*, and this Court has rejected challenges to its constitutionality as it relates to excluding jurors during death qualification voir dire. *See Odenbaugh*, 10-0268, p. 48, 82 So. at 248-49. Moreover, this Court has previously determined that article 798 does not run afoul of prohibitions against religious discrimination. *See State v. Sanders*, 93-0001, p. 20 (La. 11/30/94), 648 So. 2d 1272, 1288 ("[T]he 'single attitude' of opposition to the death penalty 'does not represent the kind of religious characteristic that underlies those groups that have been recognized as being distinctive.'") (internal ellipses omitted) (quoting *State v. Lowenfield*, 495 So. 2d 1245, 1254 (La. 1985); *see also State v. Robertson*, 97-0177, pp. 19-21 (La. 3/4/98), 712 So. 2d 8, 25-26 ("It is not the prospective juror's religion per se which justifies the challenge for cause but his views on the death penalty, regardless of their source or impetus."). These claims fail.

*Assignment of Error Nos. 17, 18, 19, 20*

Defendant argues the trial court erred in admitting certain statements he made during his interrogation at police headquarters on March 28, 2011. He argues the state used unconstitutional tactics to elicit incriminating statements. A trial court is afforded considerable discretion in determining the admissibility of a statement and its ruling "should not be disturbed unless it is unsupported by the evidence. *State v. Montejo*, 06-1817, p. 25 (La. 1/16/08), 974 So. 2d 1238, 1258. The totality of the circumstances supports the trial court's determination that defendant made a knowing, intelligent, and voluntary waiver of his rights in this case.

If a statement is a product of custodial interrogation, the state must show that the person was advised before questioning of his right to remain silent; that any statement he makes may be used against him; and, that he has a right to counsel, either retained or appointed. *Miranda v. Arizona*, 348 U.S. 436, 444 (1966). The state bears a "'heavy burden . . . to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel,'" *State v. Green*, 94-0887, p. 10, 655 So. 2d 272, 280 (La. 5/22/95) (quoting *Tague v. Louisiana*, 444 U.S. 469, 470 (1980)). Appellate courts do not review the record de novo but defer to the finding of the trial judge "unless his finding is not adequately supported by reliable evidence." *Green*, 94-0887, p. 11, 655 So. 2d at 281. A trial court is afforded that deference "because the evaluation of witness credibility often plays such a large part in the context of a motion to suppress a confession." *Id.*[28]

---

[28] The record contains three rights waiver forms signed by Turner: the first concerned the search of his vehicle; the second is a consent to questioning; and the third gave consent for detectives to take two DNA swabs from him during the interview. Although the *Miranda* waiver is specifically

As recounted in detail above, Detective Locicero was the first officer to interact with defendant in conjunction with the investigation. He testified at trial that he approached defendant inside the Carquest on Government Street just after defendant had entered the building around 8:00 a.m. to report for work the morning after the murders. After informing defendant that they were investigating a homicide, defendant responded: "Anything you need. Anything to clear my name." Detective Locicero testified that defendant was cooperative and walked with them to his car, where defendant eventually read and signed a consent to search form pertaining to his vehicle. Defendant voluntarily agreed to come to police headquarters to give a formal statement. He rode in the front seat of Detective Locicero's vehicle, was not handcuffed, and made small talk with Detective Locicero concerning musical tastes on the way to the station.

Likewise, Detective Harden testified at the hearing on the motion to suppress that, after she was notified defendant was at the Violent Crimes Unit waiting to be questioned, she and Detective Locicero entered the interview room and immediately began informing defendant of his rights. As recounted above, Detective Harden remarked that the *Miranda* rights waiver is "just as a formality um, before we start the interview . . . . It does not mean you're in trouble or going to jail or anything." At that point, Detective Harden clearly and succinctly informed defendant of his rights, and presented defendant with an official "Your Rights" form, which indicated to defendant that he was being questioned regarding a double homicide, and which

---

at issue, the circumstances surrounding each waiver demonstrate defendant affirmatively indicated he could read the rights listed on each respective form, he understood those rights, and was not promised anything for his cooperation with the investigation nor coerced into giving consent.

specifically and correctly described all of his *Miranda* rights. Defendant executed a waiver of rights form.

Defendant first claims Detective Harden minimized the severity of the situation and glossed over his constitutional rights when she began by stating "Uh, just as a formality, before we start the interview I have to advise you of your rights. It does not mean you're in trouble or going to jail or anything." In support, defendant relies on *Doody v. Ryan*, 649 F.3d 986, 1003 (9th Cir. 2011), in which the Ninth Circuit ultimately found that a defendant was not adequately informed of his *Miranda* rights when an interviewing detective implied that the *Miranda* warnings were "just formalities." *Doody*, 649 F.3d at 1003.

Defendant's reliance on *Doody* is misplaced. Although the federal court of appeal did note that the use of qualitative language by the detective, including the "just a formality" language, amounted to a "misdirection," there were other factors that, when coupled with the detective's language, combined to negate the knowing and voluntary nature of the waiver. These factors included: Doody was a juvenile; the detectives there gave repeated assurances that they did not necessarily suspect Doody of any wrongdoing; and the interviewing detective's description of the *Miranda* warnings deviated from a one-page form used for juveniles, instead amounting to 12 transcript pages of explanation, which—according to the court of appeal—"completely obfuscated" the core precepts of *Miranda*. *Id*. at 990. Furthermore, the interviewing detective informed Doody that he had the right to counsel *if* he was involved in a crime—a clear misstatement of the right to counsel. These factors, taken as a whole, rendered the *Miranda* warnings in *Doody* constitutionally deficient.

93

In contrast, only one of the factors in *Doody* is present here—the initial phrasing by Detective Harden that the *Miranda* warnings were "just formalities." As noted above, though Detective Harden used this language initially, she immediately thereafter clearly and succinctly informed defendant of his rights, and presented him with an official "Your Rights" form, which indicated to defendant that he was being questioned regarding a double homicide, and which specifically and correctly described all of his *Miranda* rights. Moreover, unlike in *Doody*, defendant was an adult. Considering the totality of the circumstances, defendant's reliance on *Doody* is unpersuasive.

Defendant also argues that Detective Harden failed to properly give him his *Miranda* warnings because, although she informed him he had the right to an attorney, and separately that he had the right to an attorney while answering questions, she did not inform him that he had the right to consult with an attorney before answering questions. As an initial matter, defendant did not raise this ground for suppression in his motion to suppress, nor did he argue the issue to the trial court. As such, he cannot raise it for the first time on appeal. *See* La. C.Cr.P. art. 841(A) ("An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."); La. C.E. art. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [w]hen the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection . . . ."); *State v. Taylor*, 93-2201, pp. 4-7 (La. 2/28/96), 669 So. 2d 364, 367-69 ("[T]he contemporaneous objection rule contained in [La. C.Cr.P. art. 841(A) and La. C.E. art. 103], does not frustrate the goal of efficiency. Instead, it is specifically designed to promote judicial efficiency by preventing a

94

defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings."), *cert. denied*, 519 U.S. 860 (1996).

In any event, defendant's argument fails. In *California v. Prysock*, 453 U.S. 355 (1981), the Supreme Court reversed the federal circuit court's determination that the rights advisement given was inadequate because it lacked an express statement that the appointment of an attorney would occur prior to the impending interrogation. Moreover, despite defendant's reliance on the more recent Supreme Court decision in *Florida v. Powell*, 559 U.S. 50 (2010), the Supreme Court in that case rejected the inverse of defendant's claim, concluding that a defendant who was informed that he had the right to consult with a lawyer before being questioned was adequately informed that a lawyer could be present during questioning. *Id.* at 62-63. The Court found that the rights advisement as a whole had "reasonably conveyed Powell's right to have an attorney present, not only at the outset of interrogation, but at all times." *Powell*, 559 U.S. at 62. Similarly, the rights advisement here, as a whole, adequately informed defendant of his rights. Notably, the waiver form, which defendant read and signed, clearly stated that he was entitled to an attorney prior to questioning.

Next, defendant argues that although he was given some *Miranda* warnings before his interview, he was not re-*Mirandized* during the course of the day, and was therefore not properly *Mirandized* before the round of questioning that ultimately led to his confession. As with his earlier argument, this was not raised in his motion to suppress, or at trial, and for the reasons noted above, is therefore not subject to review. La. C.Cr.P. art. 841(A); La. C.E. art. 103. Out of an abundance of caution, the Court has considered his argument and found it meritless. The number of times

a defendant is given *Miranda* warnings is not dispositive of whether a confession was illegally obtained. *State v. Blank*, 04-0204, pp. 12-14 (La. 4/11/07), 955 So. 2d 90, 105. Although defendant characterizes his interview as eight separate interviews (based on detectives coming and going from the interview room and switching off duties as the lead interviewer), the fact remains that he was informed of his *Miranda* rights at the outset, he never left the interview room except for bathroom breaks, and he never attempted to invoke any of his rights. To the extent the length of defendant's stay in the interview room is a factor to be considered in the overall voluntariness of his statements, it is discussed more fully below.

Defendant also argues that his confession was the result of duress, coercion, and inducements, which rendered the confession involuntary. When deciding whether a statement is knowing and voluntary, a court considers the totality of circumstances in which it was made, and any inducement is merely one factor in the analysis. *State v. Lavalais*, 95-0320, p. 6 (La. 11/25/96), 685 So. 2d 1048, 1053; *State v. Lewis*, 539 So. 2d 1199, 1205 (La. 1989). The question in each case is whether, under the particular facts and circumstances, the defendant's will was overborne at the time he confessed. *Leyra v. Denno*, 347 U.S. 556, 558 (1954); *Chambers v. Florida*, 309 U.S. 227, 237-39 (1940). Defendant argues that Detective Moore used the threat of the death penalty repeatedly, promised him leniency in return for a confession, and threatened to arrest his pregnant girlfriend to induce a confession.

The analytical framework for evaluating the voluntariness of defendant's confession is well settled. The Supreme Court previously adhered to the view that any inducement "however slight" taints a confession. *Bram v. United States*, 168 U.S. 532, 542-43 (1897). However, under current standards, voluntariness is

96

determined by the totality of the circumstances, with the ultimate focus on whether "the statement was the product of an essentially free and unconstrained choice or the result of an overborne will." *State v. Lewis*, 539 So. 2d 1199, 1205 (La. 1989) (internal quotation marks and citation omitted). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 236 (1973) ("In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."). What survives of *Bram* is the principle that a confession of guilt induced by a government promise of immunity is "coerced" and may not be used against the accused. *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 347 (1963).

In summary, the interview of defendant at the Violent Crimes Unit began at 9:43 a.m. and was first conducted by Detective Harden, who explained at the hearing on the motion to suppress that she considered defendant only a "person of interest," not a suspect in the double murder. Harden continued to question defendant until approximately 1:00 p.m., when she left to participate in the execution of a search warrant at the home of defendant's uncle, Leroy Moss, on Ritterman Street, where defendant also resided.[29]

At that point, Detective Moore arrived in the interrogation room carrying a pizza and a bottle of water for defendant. The transcript of the interrogation reveals that with the change in officers came a change in the tone of the questioning. Because she initially considered defendant only a person of interest and not a suspect, Detective Harden engaged defendant in a general conversation about his activities

---

[29] As noted above, the search ended at approximately 6:00 p.m. and led to the recovery of a wad of cash banded together and found in defendant's room, and Regions bank bags used by Carquest to make deposits found in a trash can outside the residence together with some clothing and boots. In addition, at some point later that evening, an investigator for the District Attorney's office found a handgun discarded in some bushes behind Carquest.

that weekend and why he was at the Airline Carquest that Sunday afternoon. As inconsistencies began piling up, Harden informed defendant, "let's start fresh," and then got to the heart of the matter: *i.e.*, the "huge problem" the officer could not get around, that defendant was "the last person to be in this store with these people." Defendant eventually suggested he had not been the last person in the store and that, as he was leaving, a white woman driving a blue Camry pulled into the parking lot. When asked by the officer whether the woman, whom no one else had observed on the scene, killed Mr. Chaney and Mr. Gurtner, defendant replied, "I don't know. I don't know what happened."

Unlike Detective Harden, Detective Moore considered defendant a suspect from the outset, and he thus took a more direct approach. After asking defendant several preliminary questions, Detective Moore suddenly confronted him: "Do you think with the amount of evidence we got, that you can convince the jury that you didn't do this?" Defendant replied that he did not know "what evidence y'all have." Moore told him that what the police had was a timeline "from the time you entered that building to the time you left and then something went bad. . . . Either you did it or you know who did it. Bottom line."

Defendant and the detective thereby staked out positions that would not change for several hours. Detective Moore repeatedly informed defendant that he did not believe his denials, he committed the murders or knew who did, and he faced two counts of capital murder with the prospect of capital punishment. ("[I]f I put on paper what you telling me, son, they gonna stick a needle in your arm. I'm giving you the opportunity to get your business straight.") Additionally, Moore repeatedly told defendant that he (Moore) was defendant's "lifeline" if, in fact, something had

gone wrong that was not part of the plan. ("Son, everything is pointing right at you. . . . [I]f anything went wrong—listen. Listen bro, I'll give you a lifeline right now.")

As the following excerpts demonstrate, in an effort to secure defendant's statement, Detective Moore settled on two themes: that things had gone "bad" inside the Carquest store and that he was potentially defendant's "lifeline" in what could be a capital case:

> Just keep it real. This is your lifeline, son. And I know you may think it's oh, man, it's the end of the world, it ain't . . . .

> I think things went bad. Come here. I really do bro. And I'm telling you I can keep you away from possibly getting a death sentence. I'm your lifeline. . . . . Things went bad Chief. I wanna know that you ain't a cold-hearted murder[er]. I wanna see—I wanna be able to say that, 'Hey man, this boy here got caught up. Things got bad. And it got bad quick.' That's the way I wanna think. . . . I wanna believe deep down in my heart when I leave outta here, 'Hey, this was an accident. This wasn't supposed to go down like this.' That's what I wanna feel. . . . I don't wanna think about I'm dealing with a cold blooded [killer], somebody that's heartless that don't care, son. I want—I wanna be able to say, 'Hey, this kid here made a mistake and good things gonna happen.' You know, honesty can take you a long ways bro. . . .

> I'm here to be your lifeline bro. I don't want those people when this goes to court to think they are dealing with an animal. I want them people to believe that hey, man, this thing was bad and this thing—this wasn't supposed to happen. . . . . This wasn't supposed to be what it was. . . .

> We about to shut this down. So where we at bro' cause like I say, I'm your lifeline. . . . I'm about to get outta here. And I'm gonna tell you man, it ain't looking good. . . . .

> They [forensics] just leaving Your house and it ain't good at all. . . . I'm trying to help you son. I'm trying to keep you from getting a needle stuck in your arm. I wanna be able to say, 'Well, at least there's people that can come and see him. At least there's people that can come there and be, you know, for his life.' At least your child can still come see you and be a part of your life . . . .

> I'm here to help you. . . . [R]emember what I told you son? Those people wanna know six at the top, six at the bottom of jurors is you being honest. I cain't (sic) make you no promises, but that may save your life. What happened, son? Why you did it? Things went bad?

99

Detective Moore readily conceded at the suppression hearing that up to this point in the interrogation, at approximately 8:00 p.m., all of his imploring had no apparent effect on defendant.

Then, as the detective pulled out a second photograph taken during the ongoing investigation at Ritterman Street depicting the Regions bank bags in the trash can, he launched a final attempt at cracking defendant:

> Come on son. What happened. . . . Something went wrong. . . . Be a man and open up and tell me what happened. . . . If something went bad, that's what I need to hear, son. . . . I don't feel it was just cold-blooded murder. . . . And I want you to explain to us what went down bro 'cause I'm telling right now honesty is gonna let you be able to see your child instead of seeing your child see you—remember I told you ten years from now watching you on the news [of his execution]. You don't want that man. At least you'll be there. Tell me what happened. Did things go bad? What did—tell me what happened. It went bad?

Defendant replied, "Yes sir, it did," and then launched into the Leroy Scales scenario in which he cast himself in the secondary role as a front man for the true killer. That scenario did not last long, as Moore then disclosed to defendant that the police had found a gun discarded behind Carquest:

> We're gonna get DNA and we're gonna get prints off that. The best thing for you right now son is to tell me the truth. . . . Will your prints be on this gun? Did you do this?

Defendant again replied, "Yes, sir," and told the detective that as he heard the employee call him a "ni**er," he just "clicked." "I needed the money at the time," defendant acknowledged, "so that's what happened." Defendant stated that he shot Mr. Chaney once and that after forcing Mr. Gurtner to empty the cash drawer, he emptied his gun as Mr. Gurtner fled towards the back of the store.

During the course of the interrogation, Detective Moore did not offer defendant a promise of immunity, either from prosecution for first degree murder or

the death penalty, when he held himself out as defendant's "lifeline." Moore acknowledged at the suppression hearing that he had misrepresented some of the evidence against defendant during the course of the interrogation, such as informing him that surveillance tapes from businesses in the area had caught his white BMW circling the block several times before the Carquest shootings (discussed further below).[30] However, his statements about the recovery of the Regions bank bags from defendant's room, as evidenced by photographs displayed to defendant, and the firearm discarded behind Carquest were accurate,[31] and it was that evidence which prompted defendant to give a statement. Thus, Moore's offer of a "lifeline" appears to have been an interrogation ploy, but it was not prohibited as "coerced" under *Bram* in light of the totality of the facts and circumstances.

With respect to defendant's argument concerning the length of his interview, the length of an interrogation is a relevant factor because "empirical studies have shown that, while most interrogations are brief, those that are known to have produced false confessions are much longer." *State v. Montejo*, 06-1817, p. 23, n.63 (La. 1/16/08), 974 So. 2d 1238, 1257 (discussing Saul M. Kassin et al., *Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs*, 31 Law & Hum. Behav. 381 (2007), *rev'd Montejo v Louisiana*, 556 U.S. 778 (2009), *on remand*, 06-1817 (La. 5/11/10), 40 So. 3d 952). In this case,

---

[30] Detective Moore characterized the misstatement as an "investigative tool," as opposed to an outright lie. Even in the latter case, police may deceive a defendant about the evidence against him without necessarily rendering any subsequent statement involuntary. *Frazier v. Cupp*, 394 U.S. 731 (1969) (misrepresentations relevant but do not make an otherwise voluntary confession inadmissible); *State v. Holmes*, 06-2988, p. 44 (La. 12/2/08), 5 So. 3d 42, 73 (citing *Frazier* and noting "such interrogation techniques have been upheld").

[31] Detective Moore made no representation to defendant that the weapon had in fact already been tested for DNA and fingerprint evidence and linked directly to him; the detective stated only that such tests would be performed. Even then, the statement seemingly precipitated defendant's confession, though forensic tests ultimately failed to tie the weapon to defendant.

defendant was in the Violent Crimes Unit for approximately 11 hours, and roughly five of those hours involved actual questioning. The remainder of the time, defendant sat alone in the interrogation room. The 11-hour interrogation in the present case is no longer than interrogations conducted in three other capital cases in which this Court upheld voluntariness determinations of the trial court. *See Montejo*, 06-1817, pp. 6-7, 974 So. 2d at 1244 (questioning from 4:30 p.m. to 11:00 p.m., and then again from 3:00 a.m. to 4:00 a.m.); *State v. Reeves*, 06-2419, pp. 5-6 (La. 5/5/09), 11 So. 3d 1038-39 (questioning from 11:00 a.m. to 12:40 p.m. and then again from 8:00 p.m. until 11:48 p.m.); *State v. Blank*, 04-0204, pp. 12-13 (La. 4/11/07), 955 So. 2d 90 (continuous 12-hour interrogation). Further, during the 11 hours, defendant had several bathroom breaks and food and water, and he was not subjected to any overt physical abuse. Youth is a relevant factor, but defendant was 21 years old, no longer a juvenile, and he was not coerced into giving a statement by an experienced police officer taking advantage of his inexperience.

Finally, we turn to defendant's argument that Detective Moore sought to use defendant's girlfriend as leverage, advising (or, in defendant's words, "threatening") defendant that "[I]f things start going in the direction we're going there's a chance you old lady's gonna get arrested too. . . . It's called accessory after the fact. . . . you gotta think about that bro. . . . your old lady don't need to be sitting in no jail with no baby in her stomach."

Threats to inflict harm on third persons are relevant to the voluntariness determination. *State v. Wilms*, 449 So. 2d 442, 444 (La. 1984) ("'Fear that police will inflict additional harm on another person has been recognized as a substantial factor in determining the voluntary nature of the confession.'") (quoting *State v. Johnson*, 363 So.2d 684, 686 (La. 1978)). As a general rule, however, "courts have

102

consistently held that confessions given in response to exhortations to consider the health, well-being and liberty of close relatives are admissible." *State v. Holmes*, 06-2988, p. 44 (La. 12/2/08), 5 So. 3d 42, 73 (internal quotation marks deleted) (citing *State v. Baylis*, 388 So. 2d 713, 716 (La. 1980); *State v. Winberg*, 364 So. 2d 964, 970)); *cf. Wilms*, 449 So. 2d at 445 (although police had struck defendant's pregnant wife in the stomach, defendant's choice to give a statement remained voluntary and not coerced by fear his wife would otherwise not receive medical attention). In the context of a long interrogation during which defendant maintained his innocence until the very end when confronted with hard evidence that he had committed the double murder, including when the "threat" on his girlfriend was made, Moore's comments do not appear sufficient to have overborne defendant's will and undermined the voluntariness of his confession. *Cf. Lynum v. Illinois*, 372 U.S. 528, 534 (1963) (defendant's oral confession made after police encircled her and told her state financial aid would be cut off for her infant children, and her children taken from her, if she did not cooperate, "must be deemed not voluntary, but coerced.").

*Assignment of Error No. 21*

Defendant argues that the warrant used to search the residence on Ritterman Drive was issued in violation of the Fourth Amendment due to misleading information contained therein, and the trial court therefore erred by not suppressing the illegal fruits of that search. Defendant further argues that he did not confess until investigators confronted him with the evidence obtained pursuant to the search warrant. As such, he argues that trial court should have suppressed his confession as a derivative of the illegal search.

The affidavit accompanying the application for the search warrant contained the following pertinent information:

- A witness informed detectives she had become concerned about one of the victims after he did not answer his phone after approximately 3:00 p.m., the closing time for the business;

- The witness drove to the store to check on the victim, noticed the front door was unlocked, and upon entering the business, found the victim, Edward Gurtner, deceased, and immediately exited the building and called 911;

- Police arrived on the scene and ultimately found a second victim, Randy Chaney, deceased inside the building;

- Another relative of one of the deceased men informed detectives that she attempted to contact the deceased at 3:13 p.m., to no avail;

- In the course of investigating the double homicide, detectives learned that an employee had clocked out at the Carquest location at 2:47 p.m.;

- That employee, Braillon Jones, informed detectives that he left the business at 2:47 p.m., and at that time, Mr. Gurtner and Mr. Chaney were still at work inside the building;

- When Jones left the building, he observed a black male enter the building and ask for "Eddie" [Gurtner]; Mr. Chaney informed the subject that Mr. Gurtner was in the back, and the subject walked towards the back of the warehouse;

- Jones then left the building and observed a light-colored, older model 4-door car parked next to his vehicle on the north side of the business;

- Detectives learned that on the morning of the shootings, Mr. Gurtner had identified "Lee" as being present at the Carquest to a witness, and had further identified a vehicle parked in the rear parking lot as Turner's vehicle; the witness later provided this information to detectives;

104

- Detectives identified Turner as a new employee of Carquest, and were informed he was not assigned to the location where the homicides occurred;

- Detectives made contact with Turner, who accompanied detectives to the Violent Crimes Unit, where he made the following admissions:

    a. Turner visited the Carquest where the homicides occurred the morning of the shootings, and parked his white 1990 BMW behind the business;

    b. Turner returned to the business that afternoon around 2:47 p.m. and remained in the building until closing at 3:00 p.m.;

    c. Turner unlocked the back door to the business, but forgot to lock it back;

    d. Turner witnessed Mr. Chaney remove the cash drawer from the register just before closing time;

    e. Turner left the business around closing time, and stated that Mr. Gurtner and Mr. Chaney were alone and still inside the building when he left;

- Turner provided detectives the name and contact information for an alibi witness whom he stated he was with during the morning of the murders; Detectives contacted this alibi witness, who informed them she had no contact with Turner until approximately 4:00 p.m. the day of the murders;

- When confronted with this conflicting information, Turner changed his story regarding his whereabouts on the morning of the murders several times;

- Several witnesses placed Turner at the business and as the last person with the victims before their deaths;

- Detectives obtained surveillance video footage from nearby businesses, and observed a vehicle matching the description of Turner's vehicle "circling the

105

block" on which the Carquest was located three times after 3:00 p.m. on the day of the murders.[32]

Defendant argues that the last portion of the affidavit, specifically concerning the surveillance footage obtained from a nearby business, was an intentional misrepresentation, and as such, the trial court should have quashed the search warrant and suppressed all evidence as a result thereof. At the hearing on defendant's supplemental/second motion to suppress physical evidence, Detective Locicero testified that he prepared the affidavit accompanying the application for the search warrant for Turner's residence. He further testified that, although the affidavit contained information that a vehicle matching the description of Turner's vehicle was seen "circling the block" on which the Carquest was located three times after 3:00 p.m., Detective Locicero did not personally view the videos himself, but received that information from another officer, whose name he could not recall. He was aware that an officer with the Baton Rouge City Police, Detective Phillip Chapman, was the person responsible for obtaining that video footage.

Detective Harden testified that she viewed the video footage after the search warrant had been executed, and recalled seeing a white car in the video pass by more than once, but could not recall further specifics.

Detective Chapman also testified at the hearing. He testified that he canvassed the area near the Carquest for surveillance video footage at the direction of Captain Todd Morris, who informed Chapman that they were looking for a white, BMW-type car. Chapman viewed a video from a nearby business that appeared to show a white vehicle that could have been a BMW pass the location three times. He could

---

[32] The affidavits were introduced into evidence at the hearing on defendant's motion to suppress, but were not introduced at trial.

106

not definitively state whether the vehicle was a BMW, though he believed it to be a BMW because "the outline of it was kind of . . . sporty[.]"Chapman also stated that he could not see the driver or a license plate, and because the business from which the surveillance was taken was located on a 90-degree corner, he could only see the front passenger side of the vehicles in question as they passed by. Chapman also remarked that "nowadays they are all starting to look the same, but it looked like it could possibly be a BMW." Chapman reported his findings to Captain Todd Morris and had no further involvement in the case.

Defendant takes issue with the fact that the affidavit states that a "white four door vehicle matching the description of Lee Turner's white BMW . . . [was observed] circling the block of the business Carquest after 3:00 p.m." Defendant argues that, at best, the video evidence shows three different instances in which a white car drove down a certain street, and that the language in the affidavit was a "pure misrepresentation." Defendant further argues that because Detective Locicero did not view the video himself, nor could he identify who had provided him the information concerning the footage, the ensuing statement Detective Locicero made in the affidavit was an intentional misrepresentation.

An affidavit is presumed to be valid; the defendant has the burden of showing by a preponderance of the evidence that the affidavit contains false statements. *Franks v. Delaware*, 438 U.S. 154, 156 (1978); *State v. Brannon*, 414 So. 2d 335, 337 (La. 1982); *State v. Wollfarth*, 376 So. 2d 107, 109 (La. 1979). Once the defendant has shown that the affidavit contains false statements, the burden shifts to the state to prove the veracity of the allegations in the affidavit. If the court finds that the affidavit contains misrepresentations, it must decide whether the misrepresentations were intentional. *State v. Smith*, 397 So. 2d 1326, 1330 (La.

1981). If the court finds the misrepresentations were intentional, the search warrant must be quashed. *See*, *e.g*, *State v. Rey*, 351 So. 2d 489, 492 (La. 1977); *State v. Neisler*, 94-1384, p.8 (La. 1/16/96), 666 So. 2d 1064, 1068. If, on the other hand, the court finds that the misrepresentations were inadvertent or negligent, the inaccurate statements should be excised and the remaining statements tested for probable cause. *Rey*, 351 So. 2d at 492.

Defendant is correct to point out that the only fact that can actually be inferred from Detective Chapman's observations of the footage is that three white cars passed nearby the Carquest on the afternoon in question, around the time of the homicides. Yet, the affidavit seems to ascribe more significance to these observations. Notably, however, the affidavit does not state that the footage showed defendant's vehicle circling the block three times; it merely states that a vehicle fitting the description of defendant's vehicle circled the block three times. At its broadest, the phrase "fitting the description of [a white BMW]" would include a white car.

The affidavit's "circling" terminology warrants additional scrutiny, because it implies that the *same* white vehicle, whether defendant's vehicle or not, was seen three times on the video. Based on Officer Chapman's testimony, defendant argues that there was not enough evidence for him to conclude that the white vehicle(s) he saw was in fact the same vehicle each time it appeared on the video. Assuming solely for purposes of this analysis that it was misleading, the question is whether the misrepresentation was intentional. Considering the facts as testified to in the hearing, defendant did not meet his burden in showing an intentional misrepresentation. Detective Locicero did not view the video footage himself, and instead relied on information from "someone in law enforcement" to draft the affidavit. Probable cause exists when the facts and circumstances within the affiant's knowledge, and

those of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that contraband or evidence may be found at the place to be searched. *State v. Duncan*, 420 So. 2d 1105, 1108 (La.1982). Defendant points to nothing in the record to show that Detective Locicero unreasonably relied on information he obtained from another law enforcement officer in drafting this portion of the affidavit at issue.[33] There was therefore no error in the trial court's denial of defendant's supplemental motion to suppress the physical evidence.

Moreover, even if Detective Locicero was negligent in including a statement concerning the surveillance footage without personally viewing that footage himself, defendant's remedy is to have the affidavit retested with the negligent misrepresentations excluded. After the first hearing on defendant's motion to suppress, the trial court did just that, and concluded that even without the redacted information concerning the surveillance footage, there still existed probable cause to issue the search warrant. No error is apparent in the court's ruling that the redacted affidavit still established probable cause for the search on the basis of what defendant had already confided to Detectives Harden and Moore. Specifically, putting aside entirely the information about the vehicle, defendant stated that he was present at Carquest at closing time on that Sunday afternoon and that he had unlocked the back door, and then forgot to lock it; further, the investigation had already independently revealed that the shootings occurred between 2:47 p.m. and 3:13 p.m., meaning defendant was the last known person to have seen the victims alive. The application thus established a fair probability that defendant was involved in the homicides and that the fruits and instrumentalities of the crime would be found in his residence, as

---

[33] The fact that Detective Locicero did not view the footage himself, and instead reasonably relied on information from a colleague in drafting that portion of the affidavit, undercuts defendant's argument that Detective Locicero intentionally misrepresented the information to the court.

in fact they were. *State v. Vernado*, 95-3127, p. 2 (La. 5/31/96), 675 So. 2d 268, 270 ("In many cases, the nature of the crime may make it appropriate to assume that the fruits and instrumentalities of the offense are probably stored in the suspect's residence. . . . 'Where the object of the search is a weapon used in the crime or clothing worn at the time of the crime, the inference that items are at the offender's residence is especially compelling.'") (quoting 2 Wayne R. LaFave, *Search and Seizure*, § 3.7(d), p. 384 (3d ed. 1996)).

Given the above, defendant's related argument that his confession was the product of an illegal search and should have been suppressed is moot.[34]

## PENALTY PHASE ISSUES

Defendant raises additional assignments of error related to the penalty phase of his trial (Nos. 22-31). Because we have determined the death sentences must be reversed, we do not reach these claims.

## MISCELLANEOUS

### Assignment of Error No. 32 – Cumulative Error

In his final assignment of error, defendant argues that cumulative error deprived him of due process, a fair trial, and a reliable sentencing determination in violation of his rights under the United States and Louisiana Constitutions.

This Court has held: "[T]he combined effect of the incidences complained of, none of which amounts to reversible error [does] not deprive the defendant of his right to a fair trial." *State v. Copeland*, 530 So. 2d 526, 544–45 (La. 1988), quoting *State v. Graham*, 422 So. 2d 123, 137 (La. 1982), *appeal dismissed*, 461 U.S. 950

---

[34] Defendant also argues that the items found in garbage cans outside of his residence were within the curtilage of the home, and therefore protected by the Fourth Amendment's warrant requirement. However, because the trial court did not err in denying defendant's motion to suppress, this issue is moot.

110

(1983). Although the Court has often reviewed cumulative error arguments, it has never endorsed them. Instead, the Court has consistently found that harmless errors, however numerous, do not aggregate to reach the level of reversible error. *See, e.g.*, *State v. Strickland*, 93-0001, pp. 51-52 (La. 11/1/96), 683 So. 2d 218, 239; *State v. Tart*, 94-0025, p. 55 (La. 2/9/96), 672 So. 2d 116, 164; *State v. Copeland*, 530 So. 2d 526, 544-45 (La. 1988) (citing *State v. Graham*, 422 So. 2d 123, 137 (La. 1982); *State v. Sheppard*, 350 So .2d 615, 651 (La. 1977)). *See also Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) (rejecting cumulative error claim and finding that "twenty times zero equals zero").

## CONCLUSION

For the reasons set forth herein, defendant's convictions for first degree murder are affirmed. Defendant's sentences of death are vacated and set aside, and the case is remanded to the district court for further proceedings.

**CONVICTIONS AFFIRMED; DEATH SENTENCES REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

111

SUPREME COURT OF LOUISIANA

No. 2016-KA-1841

STATE OF LOUISIANA

VERSUS

LEE TURNER, JR.

FROM THE NINETEENTH JUDICIAL DISTRICT COURT
FOR THE PARISH OF EAST BATON ROUGE

**GUIDRY, J., concurs in part, dissents in part, and assigns reasons.**

While I concur in the majority's affirmance of the defendant's convictions on two counts of first degree murder, I respectfully dissent from the majority's finding that the trial judge's ruling on the scope of voir dire requires vacating the sentences and remanding for a new sentencing hearing. Even if the trial court "overcorrected" defense counsel, who had employed a hypothetical that too closely tracked the alleged facts of the case, the defendant has not sufficiently shown that this ruling significantly and negatively impacted his ability to conduct a full and complete voir dire. The example juror cited by the majority, Sherri Harris, could have been asked by defense counsel to explain more fully her comments that "some crimes that are so horrendous that [they] should just automatically get the death penalty" and that she would likely be for "automatic death in cases that are very violent, in children, and blah, blah, blah, you know." Similarly, juror Ashley Andrews could have been asked to explain more fully her belief that "certain crimes" would merit imposition of the death penalty. However, counsel did not pursue a more open-ended approach to voir dire with regard to these jurors. Accordingly, I do not find the defendant has demonstrated the trial court's ruling rendered voir dire constitutionally inadequate.

SUPREME COURT OF LOUISIANA

No. 2016-KA-1841

STATE OF LOUISIANA

VERSUS

LEE TURNER, JR.

ON APPEAL
FROM THE NINETEENTH JUDICIAL DISTRICT COURT
FOR THE PARISH OF EAST BATON ROUGE


Hughes, J., concurs in part and dissents in part for the reasons assigned by Guidry, J.